**Jody D. McCAIN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–97–00143–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

June 3, 1999.

---

**23.** 800 S.W.2d at 543.

Stephen A. Doggett, Richmond, for appellant.

John Harrity, III, Richmond, for appellee.

Panel consists of Justices MAURICE E. AMIDEI, FOWLER, and LEE.*

## OPINION

WANDA McKEE FOWLER, Justice.

Over his plea of not guilty, a jury found Appellant, Jody D. McCain, guilty of murder. *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 1994). The jury assessed punishment at life imprisonment in the Texas Department of Corrections, Institutional Division. McCain appeals on four points of error. He alleges three errors by the trial court: (1) denying a motion to suppress evidence, (2) allowing improper cross-examination of Jody McCain at a motion to suppress, and (3) giving an improper charge instruction. In the fourth

* Senior Justice Norman Lee sitting by assignment.

point of error, McCain raises numerous allegations of ineffectiveness of counsel.

This is a tragic case, involving a heinous crime. It is tragic for the deceased—an innocent victim—and his family; and, it is tragic for Jody McCain, a twenty year old, who, a day or two before the incident, buried his father. It is also a difficult case, because McCain received imperfect representation at trial. Mistakes were made by his lawyer and the judge, and we have the difficult task of determining whether the mistakes made a difference in the outcome of the trial. It is difficult in part because we do not have the benefit of seeing the witnesses and the lawyers. We have to base our decision solely on the transcribed testimony and the evidence. The question before us in some of the points is whether these mistakes contributed to McCain's conviction and punishment. In other points, the question is whether the mistakes caused a different outcome in his conviction and punishment. As we discuss below, we affirm the trial court's judgment because we find that none of the mistakes affected the outcome of the trial.

## I. THE CONTROVERSY

The tragedy began this way. On June 19, 1995, McCain, his brother, Don Paul McCain, and a friend, Christopher Bench, were involved in a fight with several individuals outside a dance hall. These individuals, who were riding in a blue Neon, bested McCain and his companions in the fight. Their egos hurt, the McCains and Chris Bench left the dance, went to Jody McCain's house, retrieved two guns, and went back to the dance in their truck. Not seeing the blue Neon, they returned to Jody McCain's house. There, they apparently had some disagreement about whether to go out again and look for the blue Neon. Ultimately, however, they decided to try again; this time they took a fast car—a red mustang. With Don

McCain driving, Jody McCain in the front passenger seat holding a .22 caliber pistol, and Chris Bench in the back seat holding a .22 caliber rifle, they returned to the dance hall and waited across the street. Before long, they saw a blue Neon leave the dance. They followed, mistakenly believing the car contained the individuals with whom they had fought. They pulled even with the Neon. Jody McCain fired two or three shots directly at the driver's window of the Neon,[1] while Bench fired as many as 10–13 shots at the car. In all, they fired 16 shots. They killed the driver of the car, Scott Tatar. Nicole Meyer, who was riding in the front seat, was injured. At trial, McCain admitted firing a handgun at the tires of the car in an attempt to stop the car but denied firing the shots that killed Scott Tatar. The jury apparently did not believe McCain, found him guilty of murder, and sentenced him to life in prison.

## II. DISCUSSION AND HOLDINGS

### A. Motion to Suppress the Guns.

In his first point of error, McCain contends that the trial court erred when it (1) overruled a motion to suppress and (2) wrongly admitted evidence during the guilt-innocence stage of the trial. Specifically, McCain argues that the trial court should have suppressed the weapons used during the offense because they were the result of an unlawful search and seizure by the police. McCain filed five motions to suppress and his brief is unclear as to which of the motions is the subject of this complaint. However, after reviewing McCain's brief, his five motions to suppress, and the events at trial, we conclude McCain is claiming that the trial court should have granted his fourth motion to suppress. In that motion, McCain sought to suppress any evidence seized on or about July 3, 1995, including, but not limited to, guns and ammunition. According to

---

1. Although McCain denied having pointed his pistol directly at the people in the car, two passengers in the Neon testified that McCain held his pistol straight out and pointed it at the driver's window.

McCain, law enforcement officials obtained this evidence as a result of an illegal warrantless arrest conducted outside the jurisdiction of the arresting officers. We agree.

On July 2, 1995, Larry Feinstein, an investigator with the Fort Bend County Sheriff's Department and the lead officer investigating Scott Tatar's death, received a phone call from an anonymous caller. This caller told Feinstein about the shooting and several of the facts of the shooting. The caller stated that she had learned the facts from her boyfriend and that she knew who the shooters were. She gave Feinstein their names: Chris Bench, Jody McCain, and Don McCain. The caller also told Feinstein that the McCain brothers and Bench had been doing a lot of talking about the shooting and that they were becoming nervous because so many people knew of their involvement. The caller stated that they were planning to go to Houston to "hide out".

This information agreed with what Feinstein had learned about the shooting and with information he had heard the night before from the Chief of Police of Wallis, Texas, that Jody McCain was one of the shooters. According to the Chief, McCain's name came from one of the Chief's reliable confidential informants. Acting on this information, Feinstein contacted his office and asked for some officers to meet him at the McCain residence. Feinstein's greatest fear was that the shooters would flee before he could obtain a warrant. So, he immediately drove to the McCains' residence in *Wharton* County.

There, Feinstein detained Jody and Don McCain. According to law enforcement officials, Jody McCain was immediately read his *Miranda* rights and told that he was being detained for questioning in a homicide investigation. He signed a consent to search form authorizing the officers to search the premises, buildings, and vehicles at his residence there in Wharton county. The officers then transported Jody McCain to the Sheriff's office in Fort Bend County, where Feinstein read Jody McCain his *Miranda* rights, placed him in an interview room and asked him if he wanted to waive his rights. McCain declined and stated that he did not want to say anything. Feinstein left the room and told McCain to relax and compose himself. Twenty minutes later, another officer, Officer Rick Sousley, went to McCain's interview room and asked him if he wanted anything to drink. While in the kitchen at the Sheriff's office, McCain ultimately admitted that he was involved in the shooting; he also told Sousley that Chris Bench had hidden the guns somewhere on his property. He then told Sousley that he thought he needed an attorney. Upon hearing this request, Sousley ceased all conversation with Jody. Around this time, officers obtained arrest warrants for both Don and Jody McCain.

The following day, the Fort Bend officers went to the McCain residence in Wharton County and began to search the heavily wooded fifteen acres. After twenty or thirty minutes, an officer with the Sheriff's Department discovered the pistol used in the shooting. It was inside a bag stuffed in a hole at the base of a tree.

■ It is the discovery of this pistol that McCain sought to suppress. But, after a hearing on his motion to suppress, the trial court denied McCain's motion.

■ According to Article 2.12(1) of the Texas Code of Criminal Procedure, sheriffs and their deputies are peace officers. *See* Tex.Code Crim. Proc. Ann. art. 2.12(1) (Vernon Supp.1999). A peace officer cannot make warrantless arrests anywhere in the State. *See Angel v. State,* 740 S.W.2d 727, 732 (Tex.Crim.App.1987). Common law and statutory law limit a peace officer's authority to his own geographic jurisdiction. *See Dominguez v. State,* 924 S.W.2d 950, 953 (Tex.App.—El Paso 1996, no pet.); *Thomas v. State,* 864 S.W.2d 193, 195 (Tex.App.—Texarkana 1993, pet. ref'd). "Generally, a peace offi-

cer is a peace officer only while in his jurisdiction and *when the officer leaves that jurisdiction, he cannot perform the functions of his office.*" *Dominguez,* 924 S.W.2d at 953–54 (emphasis added). The officers who searched the property and recovered the pistol were officers in the Fort Bend County Sheriff's Department, and they were unable to perform the functions of their office while they were in Wharton County. Thus, the trial court should have suppressed the pistol and not allowed it into evidence. But, in spite of this conclusion, our inquiry is not ended. We must still determine if the court's error was harmful. As we discuss below, any error committed by the trial court was harmless.

Rule 44.2 of the Texas rules of Appellate Procedure states,

(a) *Constitutional Error.* If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

(b) *Other errors.* Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

TEX.R.APP. P. 44.2. As the error in this case is the failure to grant the fourth motion to suppress and the subsequent admission of the pistol and some ammunition, we find no constitutional error and apply Rule 44.2(b). That rule requires us to determine whether the admission of the pistol and ammunition affected a substantial right.

■ "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997). At trial, McCain testified that he was involved in the shooting, was holding a .22 caliber pistol, and that he fired two or three shots at the blue Neon in an attempt to stop the car. Moreover, law enforcement officers testified about the .22 caliber shell casings they found at the scene of the incident. There was also testimony from friends of McCain and from one of the victims that McCain either had a pistol or shot it. Considering all of this evidence showing that McCain shot a pistol, any error in the failure to suppress the pistol and ammunition was harmless under Rule 44.2. We overrule McCain's first point of error.

**B. Allowing Cross–Examination of McCain at the Hearing on the Motion to Suppress.**

■ In his fourth point of error, McCain contends the trial court erred at the hearing on the motion to suppress when it allowed the State to ask Jody McCain if he committed the offense. McCain contends that he took the witness stand for a very limited purpose: to detail the "events surrounding his arrest", to show that the consent to search was not freely given, and to show that the confession he gave to Investigator Sousley was illegally taken. Given this very limited purpose, McCain argues that the State should not have been able to cross examine him about the circumstances of the actual offense. When cross-examined, McCain denied any involvement in the shooting, and made the statement, used so effectively against him at the guilt-innocence phase of trial, "We didn't have nothing to do with the shooting."

Initially, we must determine if McCain is right that a defendant may testify for a limited purpose at the motion to suppress. The Court of Criminal Appeals has said that he may. *See Johnson v. State,* 803 S.W.2d 272, 284–85 (Tex.Crim.App.1990) (holding that it was error for the court to allow the State to cross-examine the defendant's wife on matters that were irrelevant to the suppression hearing). The issue before us is whether the prosecutor went beyond the scope of the motion to suppress when he asked McCain if he was in

the car when it pulled up beside the blue Neon, and whether McCain and Bench shot at the car.[2] Although the issue is close, we believe he did go beyond the scope of the motion to suppress.[3]

■ However, having concluded that the trial court erred when it allowed this questioning, once again, we must determine if the error was constitutional error or "other error" as described in rule 44.2 of the Texas Rules of Appellate Procedure. *See* TEX.R.APP. P. 44.2. Constitutional error has been greatly restricted. *See Cain v. State*, 947 S.W.2d 262, 264 (Tex.Crim.App. 1997). This error does not fall into that category, because this error does affect a substantial right—McCain's Fifth Amendment right against self-incrimination. *See Kotteakos v. United States*, 328 U.S. 750, 757–66, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The question then becomes whether we can say beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

The only way we can answer this question is to look at what testimony came into evidence because of the error, and then to consider it in the context of all of the evidence presented.

At the motion to suppress, McCain denied that he, his brother and Chris Bench shot at the blue Neon. But, at trial, McCain admitted that he and his friend shot at the car. Knowing that McCain had changed his story, the prosecutor asked McCain about the testimony he gave at the motion to suppress.

Q: Do you remember an attorney by the name of Fred Felcman asking you some questions?

2. For example, the prosecutor asked,
Q: You heard Rick Sousley say that your car got up beside the blue car, that Jody leaned out and fired two shots at the front tire, all right?
A: (Witness nods affirmatively.)
Q: The question is, did that occur?
A: No, it didn't.
Q: You didn't have anything to do with the shooting, in other words?

A: Yes, sir.

Q: Do you remember him asking you, I think he said, "Were you the one that shot at the car?" and you said, "no"?

A: Yes, sir.

Q: Well, that wasn't true back then, was it?

A: No, sir, I was— I was scared.

\* \* \*

Q: Do you remember when Mr. Felcman asked you, and I want to quote specifically, he said, he said— and he was asking you this question. He said, "You leaned out of the car and fired shots at the blue Neon; is that right?" And you said, "No, I didn't"?

A: Yes, sir.

Q: Okay. That's not true, is it? You did fire at the blue Neon, didn't you?

A: Yes, sir.

Q: When you were in court that other time, you knew what you were doing then right?

A: Yes, sir.

Q: And you knew enough to lie about what you did to protect yourself, didn't you?

A: I had my reasons.

Q: Well, were you claiming that you were temporarily insane back then when you were lying?

A: No. The reason why I did that then, I would have told the truth then. Detective Sousley offered me a deal. He said that I would not be charged with murder if I gave Chris up, so I said Chris did it.

A: We didn't have nothing to do with the shooting.

3. At the motion to suppress, both parties and the judge apparently recognized that the proceedings were for a limited purpose. When McCain's attorney tried to inquire about the results of the ballistics tests, the D.A. objected that it was outside the scope of the hearing. The judge told McCain's attorney to move on.

Q: But the D.A.'s Office wouldn't go along with that, would they?

A: It happened. It was just between me and him.

Q: But it ended up being with the D.A.'s Office, right?

A: I don't know. I don't know.

\* \* \*

Q: Do you remember on a prior occasion in this court testifying, "We didn't have nothing to do with the shooting"?

A: That's right, I said that.

Q: Okay. And now you're changing your story and you want the jury to believe that you got in the Mustang, you and your brother, and you took guns and you went out and you chased this car down and you fired at it, but you didn't intend to kill anybody?

A: That's true.

■ So, having seen what the State was able to do at trial because of the error made at the motion to suppress, we must decide if the error contributed to the jury's decision, first on guilt, and then on punishment. When we look at the guilt phase, we find one thing that convinces us that this testimony had no impact on the decision of guilt: the jury was charged on the law of parties. The charge stated the following:

> All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by conduct of another for which he is criminally responsible, or both.
>
> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to com-

mit the offense. Mere presence alone will not constitute one a party to an offense.

McCain's testimony about what he did falls within the parameters of this charge on parties. McCain unequivocally admitted his involvement in the crime. In fact, he did this numerous times. Although he tried to maintain that he only intended to shoot the tires of the car, his testimony made this claim unbelievable. For example, the evidence showed that Scott Tatar and Nicole Meyer were shot approximately nine times. Scott was shot three times in the head alone. A police officer testified that he counted 16 shots fired. In addition, before McCain took the stand, one of the girls who rode in the back seat of the blue Neon testified that she saw the car McCain was in pull up next to the Neon, saw someone holding a pistol in the front passenger seat of the car, and saw him shoot directly at the driver of the blue Neon. Nicole Meyer also testified that the shots seemed to come straight at her and Scott, as if someone were trying to shoot them. The girls also testified that the shots continued after the blue Neon left the road. Police testimony confirmed this. One shot came in through the rear of the blue Neon. No shots hit any of the tires. The closest a shot came to hitting a tire was the shot that came through the rear of the car—it came out just above a tire. On top of all of this evidence, McCain proffered an account that, by any measure, strained his credibility.

In spite of the testimony from the passenger in the back seat of the blue Neon, McCain still tried to maintain that he shot only at the tires of the car. The first time McCain took the stand, his counsel tried to show (1) how Jody McCain did not want to be involved with the attempt to find the blue Neon, but went along to protect his brother,[4] and (2) that Jody McCain did not

---

4. Jody McCain's mother testified that Don McCain's hand was missing several fingers. As a result of this handicap, Don was subject- ed to a great deal of abuse by other kids. Jody, even though he was the younger broth-

shoot Scott Tatar (Jody McCain contended that he was only shooting at tires).

Q: They wanted to go back out?

A: Yes. They wanted to go finish it— go fight them again.

Q: You didn't want to?

A: No, sir.

Q: Were they egging you on?

A: I just— I didn't— I didn't want to leave my brother alone. I was scared— I didn't want nothing to happen to him. I was under a lot of pressure, and I didn't want nothing to happen to my brother.

Q: Did you shoot anybody that night?

A: No, sir, I didn't.

This attempt to sidestep responsibility failed badly. Immediately on cross-examination, the prosecutor made it clear that it was ludicrous for McCain to disavow responsibility.

Q: Now, you will agree with me, then, that a shooting did occur on the night of either June 29 th or June 30 th at Riverside hall?

A: Yes, sir.

Q: And somebody got shot?

A: Yes, sir.

Q: And you will agree with me that whoever shot Scott Tatar intended to shoot him?

A: No, sir.

Q: You will agree with me that the shooting caused his death?

A: Yes, sir.

\* \* \*

Q: All right. Are you telling this jury, then that you and your brother and

Chris Bench didn't have anything to do with this shooting?

A: No, sir.

Q: What are you telling them specifically?

A: We did it, we did it.

Q: You did it, okay. And your brother was driving the Mustang; is that right?

A: Yes, sir.

Q: And Chris was in the back seat?

A: Yes, sir.

Q: And you were in the front seat?

A: Yes, sir.

Q: And both of you fired weapons, didn't you?

A: Yes, sir.

Q: And Chris Bench fired the rifle; is that right?

A: That's correct.

Q: So when I showed that Ruger to the firearms examiner and he said that there were casings from that Ruger found on the road, that's true, isn't it? [5]

A: Yes, sir.

McCain's testimony also was simply not believable. Later, the prosecutor brought out that the guns used in the shooting were hidden. He asked why McCain would hide the guns if the shooting was not his fault. McCain claimed that his friend, Chris had hid them. Then the prosecutor asked McCain why, if the shooting was not his fault, he did not contact the authorities about the incident. McCain claimed that he was unaware that anyone was hurt.

A: I didn't know somebody had gotten shot.

Q: Did you see the car run off the road?

er, took it upon himself to become his brother's protector.

5. The firearms examiner testified that he found three casings from the Ruger and six shells from the rifle. Because both weapons were .22 caliber, the expert could not determine which of the weapons fired the shots that killed Scott Tatar. Later in the testimo-

ny, the prosecutor would bring out through McCain's testimony that Scott Tatar was shot three times in the head, and once in the arm, that the passenger's window was completely shot out, the front passenger's door had one bullet in it, the window frame above that door had three shots in it, and that Nicole Meyer was shot at least once.

A: I saw—— I saw it.

Q: You saw it run into a pasture?

A: Yes.

Q: And you didn't think anybody had been shot?

A: I didn't—— I didn't know.

Q: Did you see the windows break in the car?

A: No, I didn't.

Q: Did you see the bullet holes that y'all put in it?

A: No, sir.

Q: And you want this jury to believe that you didn't know anybody was shot when that car ran off the road with all of those holes in it?

A: I didn't know. I didn't know.

Considering the charge given, the foregoing evidence is more than sufficient to convict McCain for the murder. *See Cain v. State*, 976 S.W.2d 228, 234 (Tex.App.— San Antonio 1998, no pet.); *see also McFarland v. State*, 928 S.W.2d 482, 496 (Tex.Crim.App.1996) (stating that proof beyond a reasonable doubt that appellant fire the fatal shot is not necessary for conviction when the jury is charged on the law of parties). Because of the abundance of evidence proving guilt, we are of the opinion that the error made at the suppression hearing did not contribute to McCain's conviction.

■ Although it is a much more difficult question, we reach the same conclusion as to punishment. Undoubtedly, the jury was already lining up against McCain. It apparently took the jury only one hour to decide to convict. Based on the testimony, the jurors probably resented three threads that ran through McCain's testimony. First, he refused to admit any intent to kill, even in the face of testimony that he, his brother and their friend grabbed guns and got into a fast car to catch the blue Neon, and testimony that he shot into the blue Neon directly at Scott Tatar. Second, he refused to accept any responsibility for Scott Tatar's death. Third, he was almost devoid of remorse. He showed no remorse for Scott Tatar's death and no sorrow for the loss Scott's family suffered. As the testimony excerpts below show, McCain appeared shifty and remorseless, leading the jury to conclude that he felt blameless and unaccountable.

McCain steadfastly maintained that he had no intent to shoot anyone, and certainly, no intent to kill—even when the evidence clearly showed that he, his brother and his friend, Chris, went to McCain's house got guns, and went looking for the blue Neon. After a while, this contention became utterly unbelievable, making McCain appear shifty. This theme started very early in the prosecutor's cross-examination of McCain.

Q: You told the jury just a minute ago that y'all wanted to pay these guys back, right, and y'all went out looking for them?

A: Yes, that's correct.

Q: And when y'all got the guns, you got the guns so that you could get into a gunfight with somebody. You weren't going to get into a fist fight, were you?

A: No, it was just going to be a fist fight.

Q: It was going to be a fist fight?

A: Right.

Q: Why don't you explain to this jury how you can pull a car up beside another one and start shooting at it and that's going to turn into a fist fight?

A: I don't know—— I don't know—— I . . .

Q: Let me break it down a little bit simpler for you. Okay. You're not telling the jury that the guns accidentally went off, are you?

A: No.

Q: Okay. So when you picked the gun up, aimed it at the blue car and pulled the trigger, that was a voluntary move, wasn't it?

A: Yes.

Q: You intended for the gun to be discharged so a bullet could go out of the gun?

A: Not— not to shoot anyone.

Q: Okay. We'll assume that you didn't intend to shoot anyone, but you did intend for the gun to go off; is that correct?

A: I, I— I don't know. I don't know what I was thinking.

Q: When you pulled the trigger on the gun, did you intend for a bullet to go out of the barrel, or did you just think it was just not going to go off?

A: I, I just— I intended for a bullet to come out.

Q: Okay. And we know from the firearms examiner that you intended that to happen at least three times, didn't you?

A: No. I didn't know three— it was one time that I know of.

Q: You're telling me that the firearms examiner is not telling the truth that the casings he found, that three of them didn't come from that pistol?

A: I don't know. I don't— I only remember firing one time, that's all.

Q: So you don't know how the other two casings got on the roadway?

A: I . . .

Q: Did your brother take the Ruger and start firing it?

A: No.

Q: And Chris had the rifle, right?

A: Correct.

Q: Well, then how did the other two shots [from the pistol] get fired?

A: I don't know.

Q: Now, you heard me talking to Officer Banks when he testified, and we were counting the number of shots fired?

A: Correct.

Q: And he counted up about 16 shots, right?

A: That's correct.

Q: You're not saying that those bullets were never fired at that car, are you?

A: I don't— because— my memory, I don't remember. I can't see it in my head. I don't remember.

Q: Are you claiming that you were temporarily insane?

A: Possibly. I didn't— I wasn't in control.

And later, this exchange occurred.

Q: All I want to know is if you fired a gun at a car full of people, do you believe that that person has the intent to kill someone?

A: Yes.

\* \* \*

Q: So if you fired a gun at a car full of people, you have to admit that you had the intent to kill somebody?

A: I didn't have no intent. It was just going to be a fight, a fist fight.

Q: I'm not following you on this.

A: I was— we were going to try to shoot out the tire.

Q: Well, you will agree with me that from the evidence the passenger's window got shot out, right?

A: That's correct.

Q: And you will agree with me that Scott Tatar got shot in the head three times, right?

A: That's correct.

Q: And you will agree with me that he got shot in the arm one time, right?

A: That's correct.

Q: And you saw those pictures that I introduced, you'll agree that the passenger-side door where Nicole was sitting had one bullet hole in it, right?

A: That's correct.

Q: And you will agree with me that the window frame above that door had three holes in it, right?

A: I didn't— I didn't see it.

Q: If there is a picture of that, would you agree with it?

A: Yes.

Q: Would you agree with me that Nicole Meyer got shot in the hand one time at least?

A: Yes, sir.

Q: Would you agree with me that that adds up to about nine to ten shots in the cab of the vehicle?

A: Yes, sir.

Q: And are you still telling this jury that y'all had no intent to kill anyone?

A: I had no intent.

Q: And do you think that they should excuse you and find you not guilty for that?

A: I don't want to be found guilty of murder.

There is more testimony by which McCain waffles on what the group intended to do when it went to his house to get the guns. In addition, at the punishment stage, *after the jury had already convicted him of murder*, McCain still refused to admit responsibility.

Q: Is there any reason why they shouldn't give you life in the penitentiary for taking that boy's life?

A: I didn't kill Scott Tatar.

Q: And you don't even think you had anything to do with it, huh?

A: I don't know. I—— I'm not guilty of murder, but I did have something to do with it.

Q: And even now sitting here before this jury, when you know that your punishment is in their hands, you still refuse to admit that you killed that boy?

A: I did not kill him.

Q: You don't think you killed him just as much as Chris Bench did?

A: I didn't shoot anyone.

Finally, and possibly the most damaging aspect of McCain's testimony, is that he never once expressed any regret or sorrow at having had a role in Scott Tatar's death. Only twice in his testimony did he even admit that he had made a mistake. Not once did he express any regret or sorrow to the family. His only remorse seemed to be for his own plight should he be convicted. During the entire trial, his sole focus was what was going to happen to him. At his first opportunity to show some remorse, at the end of his first time on direct, here is what he said.

Q: Is there anything you want to tell the jury?

A: I made a mistake. I didn't shoot anybody. I won't—— I'm asking for a second chance.

Then, after the jury had convicted him of murder, these were his first words to the jury:

Q: Jody, the jury has found you guilty of murder. Is there anything that you would like to say to the jury now?

A: I didn't kill Scott Tatar.

Immediately after this, his lawyer asked him questions to establish that he should be given probation. Then, on cross, the prosecutor examined why McCain thought he was entitled to probation. McCain's answer was,

A: I'm not a criminal.

Q: That's the whole point. Right now sitting here before this jury you still don't think you did anything wrong, do you?

A: I know what I did wrong, but I wasn't a criminal before this happened. I'm not a bad person.

At the very end, with his last opportunity to say he was sorry, he merely asked for forgiveness and repeated his oft-repeated theme that he did not shoot Scott Tatar.

Q: Anything else?

A: Just—— I just want to—— I would like a chance to do it, to make it right, to help.

Q: Well, what do you think you can do to make it right?

A: I'm just asking for forgiveness.

Q: Is there anything else you want to tell the jury?

A: I didn't shoot him. I just want a second chance. That's all.

Q: You said you didn't shoot, you mean you didn't shoot Scott?

A: I didn't shoot Scott.

These were McCain's last words to the jury.

Considering all of the testimony he gave, the jury could not have trusted McCain—even before the prosecutor impeached him with prior inconsistent testimony. Frequently, he was unable to give a straight answer. With the exception of brief testimony which came from McCain's mother, there was no evidence that would make the jury feel some pity or sorrow for McCain. On the other hand, there is overwhelming testimony of guilt, of a denial of responsibility, of a complete lack of remorse or accountability for his role in Scott Tatar's death. In fact the only time McCain seems to show any emotion is when he expresses his fear of being found guilty and sent to prison.

We are aware of the mitigating factors—his relatively young age, the recent death and burial of his father, the complete absence of a criminal record. In spite of these factors, we still are of the opinion that the jury still would have given him a life sentence. Thus, after much thought and a very careful review of the record, we conclude that the impeachment of McCain—with testimony that the trial judge improperly admitted—did not contribute to his life sentence.

## C. Failure to Give the Mandatory Parole Instruction

In his second point of error, McCain contends the trial court erred by not giving the mandatory parole instruction as required by the Texas Code of Criminal Procedure. *See* TEX.CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (Vernon Supp. 1999). Article 37.07, section 4(a) states that, in the penalty phase of a felony trial where the punishment is to be assessed by the jury, the judge should charge the jury in writing with a specific charge from the Code of Criminal Procedure. *See id.* The charge states the following:

"Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

"It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

"Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn. If the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

"It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

"You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant." *Id.*

The judge did not use this instruction; instead, he charged the jury in the follow-

ing way: "You are not to discuss among yourselves how long the defendant would be required to serve the sentence, if any, that you impose. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and the Governor of Texas and must not be considered by you."

 McCain argues that this was an improper jury instruction, and therefore, that the trial court erred in giving it. However, when the trial court presented its proposed charge to the parties, McCain stated that he had no objection to the charge. By doing this, McCain waived his right to complain about any error in that charge. *See Ly v. State*, 943 S.W.2d 218, 221 (Tex.App.—Houston [1 st Dist.] 1997, pet. ref'd). As stated by the First Court of Appeals, "a defendant who affirmatively states no objection to a jury charge at trial may not challenge on appeal any error in that jury charge." *Id.* We overrule McCain's second point of error.[6]

### D. Alleged Ineffective Assistance of Counsel

 In his third point of error, McCain contends he was denied effective assistance of counsel.[7] For counsel to be ineffective at either the guilt/innocence or punishment phase of trial, the attorney's actions must meet the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), requiring that a defendant show the following two things: (1) that his counsel's representation fell below an objective standard of reasonableness, and (2) the probability that, but for counsel's errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Hernandez v. State*, 988 S.W.2d 770, at 770–71 (Tex.Crim.App. 1999) (overruling *Ex parte Cruz*, 739 S.W.2d 53(Tex.Crim.App. 1987). and *Ex parte Duffy*, 607 S.W.2d 507 (Tex. Crim.App. 1980) and holding that the court previously had misinterpreted *Strickland* when it decided that different standards should apply to allegations of ineffective assistance of counsel at the guilt/innocence and punishment phases). In looking at these requirements, however, a court also is to keep in mind that the right to counsel does not guarantee an error-free counsel or counsel whose competency is judged by hindsight. *See Hernandez v. State*, 726 S.W.2d 53, 58 (Tex.Crim.App.1986).

McCain argues that his counsel made many errors which prejudiced his defense. We have grouped these alleged into six categories, which we will address separately in chronological order.

### 1. *The decision to call McCain at the motion to suppress hearing.*

6. Even if McCain had objected, we would overrule his point of error because this charge was not harmful to McCain. It unequivocally told the jurors they were not to discuss among themselves how long the defendant would serve, noting that this decision was within the exclusive province of the Board of Pardons and Paroles. Unless otherwise shown, we are to assume the jury followed this instruction. *See Eldridge v. State*, 940 S.W.2d 646, 650 (Tex.Crim.App.1996). If the jury did not discuss parole, the charge accomplished the same result as the charge in the code. In short, McCain was not harmed. *See Almanza v. State*, 686 S.W.2d 157, 173–74 (Tex.Crim. App.1984).

7. McCain has combined many complaints within a single point of error. A point of error that contains more than one specific ground of error is a multifarious point of error. *See Marcum v. State*, 983 S.W.2d 762, 767 n. 1 (Tex.App.—Houston [14 th Dist.] 1998, pet. ref'd) (citing *Bell v. Texas Dept. of Criminal Justice—Institutional Div.*, 962 S.W.2d 156, 157 n. 1 (Tex.App.—Houston [14 th Dist.] 1998, no pet.)) Therefore, McCain's point of error is multifarious and we could refuse to review it. *See id.* However, a court may consider multifarious points of error if the court can determine, with reasonable certainty, the alleged error about which the complaint is made. *See id.*(citing *Thornton v. D.F.W. Christian Television, Inc.*, 925 S.W.2d 17, 22–23 (Tex.App.—Dallas 1995), *rev'd on other grounds*, 933 S.W.2d 488 (Tex.1996)). As we are able to determine the errors about which McCain complains, we will, in the interest of justice, consider those complaints that are supported by argument and authority.

■ The first category of potential error alleged by McCain involves his trial counsel's decision to call McCain to testify during the motion to suppress hearing. McCain argues that his trial counsel should not have allowed him to testify because there was no valid purpose to the decision and it resulted in damaging testimony. To support this argument, he claims that when he took the stand, the following had already been established through testimony of police officers: (1) his arrest was in another county; (2) the offense was not committed within the view of the officers; (3) the arrest was made without an effort to procure a warrant; and (4) the appellant was questioned even after he invoked his right to remain silent and his right to counsel. McCain argues that he was harmed "because he gave incorrect testimony regarding his participation in the crime that was later used to impeach him." As we discuss below, although part of his argument is valid, we still conclude that his lawyer's actions were not ineffective.

McCain's trial attorney called McCain to the stand at the suppression hearing to rebut some of the police officers' testimony. The police officers and McCain gave completely different descriptions of the arrest at his house and of his confession at the police station. It is clear from the record that McCain was trying to prove that the confession was forced. McCain was the only one who could give his version of what happened. For the confession to be suppressed on the basis of duress, McCain had to testify.

In this point McCain also argues that his trial counsel was ineffective because McCain testified differently at the suppression hearing than he did at trial. There is nothing in the record to show that McCain's counsel had anything to do with this discrepancy—other than calling McCain to the stand. Thus, McCain has not shown that his counsel's representation fell below an objective standard of reasonableness merely because McCain changed

his story between the suppression hearing and the trial. Moreover, we have already held that McCain's impeachment at trial with his testimony from the motion to suppress did not contribute to his conviction or punishment. We overrule this complaint.

### 2. Alleged error during jury selection.

■ The second category of potential error alleged by McCain is error during the jury selection process. McCain first contends that his trial counsel was ineffective for failing to ask the jury panel whether any of them were crime victims, if they had ties to law enforcement, what they thought about parole, or if they had previously served on a jury. There are three reasons this claim is misplaced. First, McCain's lawyer did not inquire into each of these areas, the jury was asked each of these questions. The record reflects that the court and the prosecutor asked the jury panel whether any member of the jury panel knew any members of the District Attorney's office, or whether any member of the jury panel knew any members of the district Attorney's office, or whether they, or any of their relatives, were employed in law enforcement. In addition, the prosecutor discussed prior jury service with the jury panel members. From the record, it appears the attorneys already knew through jury panel questionnaires who had previous jury experience. McCain's trial lawyer did not need to discuss these topics with the jury panel as the questions had already been asked and answered during the State's voir dire. Moreover, the trial record reveals that McCain's trial attorney had a limited amount of time to conduct voir dire. It was unnecessary for him to revisit these issues during his allotted time since they had already been covered. The only subject that appears not to have been discussed was parole. However, we find this lapse inconsequential, since the charge instructed the jury no to discuss parole. Second, McCain fails to show this court

why any of these actions amounted to ineffective assistance of counsel. Third, he makes no claim that the outcome of the trial was different than it would have been had he asked these questions. In summary, McCain failed to meet either prong of *Strickland.*

Next, McCain alleges that his trial counsel was ineffective for failing to have three jury members excluded for cause from the panel. Specifically, McCain argues that his trial counsel failed to challenge for cause (1) venire person Warren because Warren could not consider probation in a murder case and (2) venire person Williams because she claimed the State did not have to prove its case beyond a reasonable doubt. McCain also claims his trial counsel was ineffective because he did not preserve any error in the trial court's refusal of his challenge to venire person Zepeda for cause; he claims counsel could have preserved this error by objecting to Zepeda once Zepeda was seated and by asking for additional strikes.

■■■ As for jurors Williams and Warren, McCain's interpretation of the record is inaccurate. Although Williams originally stated that she could not hold the State to prove its case beyond a reasonable doubt, McCain's own counsel rehabilitated her. Warren also had a similar reversal of opinion. While originally stating that she could not consider probation, when told

that the full range of punishment form probation to life, she said she could consider probation.

■■■ As to venire person Zepeda, the record is insufficiently developed to enable us to say that counsel was ineffective.[8] There are two problems. First, Zepeda gave an opinion that trial counsel should have explored further but did not. If counsel had acted appropriately, he would have taken Zepeda before the judge to confirm a bias. *See Credille v. State,* 925 S.W.2d 112, 115 (Tex.App.—Houston [14th Dist.] 1996, pet ref'd). Then he should have requested that Zepeda be struck for cause, and, if the court refused his request, he would have preserved on the record that the judge's ruling caused him to accept on the jury one or more objectionable jurors. *See id.* McCain's lawyer did not do this. Thus, the record does not show that McCain had to accept an unacceptable juror. Second, this record does not conclusively show that Zepeda had a true bias. She did say that she would have a "problem sitting on the case." But, no one asked her if she could listen to the evidence and follow the judge's instructions. Thus, we cannot say on the basis of this record that Zepeda should have been struck for cause. In short, McCain has not met *Strickland* on this claim.[9]

8. During voir dire, the following exchange occurred between the prosecutor and venire person Zepeda after the prosecutor asked if anybody on the jury panel knew the victim or the victim's family. Zepeda responded:

A: I teach and I have only heard the name.
Q: Okay. Is there anything about that—well, you don't really have a relationship, but anything about the fact that you have heard that name that would cause you a problem sitting on this jury panel?
A: Probably, because I have heard comments from—
Q: Okay. Don't tell me what anybody said—
A: Okay.
Q: —because I don't want everybody else to know about it. That's all right, but do

you think it would cause a problem sitting on the case?
A: (Nods head affirmatively.)

9. We recognize that it is very difficult to obtain a reversal on the basis of alleged ineffective assistance of counsel during the voir dire process. *See Delrio v. State,* 840 S.W.2d 443, 445–46 (Tex.Crim.App.1992). The most likely way to obtain a reversal for ineffective assistance of counsel is by presenting evidence at a motion for new trial. McCain's counsel filed a motion for new trial, however, a hearing was never held. He claimed he needed—but was unable to obtain soon enough—a transcription of the trial before he could determine what complaints to raise on the motion. He asked this court to abate the appeal to enable him to pursue the motion for new trial. We took that motion with the case and now

### 3. The failure to call a ballistics expert.

■ The third category of potential error alleged by McCain concerns his trial counsel's failure to call an expert to testify at trial. Specifically, McCain argues that his trial counsel should have hired (1) a ballistics expert to discuss the pistol and the bullet recovered from the crime scene and (2) a psychological expert to testify to his "intelligence and susceptibility to outside influence."

Counsel does not say in his brief how a ballistics expert or psychiatric expert could have helped McCain or claim that testimony by these experts would have produced a different result. Consequently, this complaint does not met either prong of *Strickland*.

### 4. Evidence of McCain's jail fight and segregation from other prisoners.

■ The fourth category of potential error alleged by McCain is the admittance into evidence that he was segregated from the other prisoners in jail because he had been in a fight. McCain argues that his trial counsel should have subpoenaed jail records or jail personnel to corroborate that he was in segregation not as punishment but for protection. Citing to *Ex Parte Guzmon*, McCain argues that the failure to refute or explain a jail fight offered in punishment is ineffective assistance of counsel. *See Ex parte Guzmon*, 730 S.W.2d 724, 733 (Tex.Crim.App.1987).

Because of the state of the record here, we do not even get to the *Guzmon* issues. Since there was no hearing on the motion for new trial, the record does not reveal what the jail records would have shown or what the jail personnel would have said. Without this evidence, we cannot determine whether these things would have helped him, and, thus, we cannot determine if his counsel should have subpoenaed these people and records or if McCain was harmed.

As a consequence, McCain again has not met *Strickland*.

### 5. Victim Impact Testimony.

The fifth category of alleged ineffective assistance of counsel is his counsel's failure to object to victim impact testimony. McCain argues that his trial counsel was ineffective for failing to object to victim impact testimony from Scott Tatar's father and girlfriend during the punishment phase of the trial. To support this argument, McCain cites thirteen problems with the testimony, some of which are supported by authority, some of which are not.

We will address four areas of allegedly inadmissible testimony:[10] 1) Mr. Tatar's testimony about the incident and the impact of Scott's death on his family; 2) the girlfriend's testimony about her injuries;

deny it. McCain has cited no authority allowing us to abate the case for an out of time motion for new trial held for the purpose of developing a record on appeal. And, in fact, the Court of Criminal Appeals has held recently that we cannot abate for an out of time motion for new trial. *See Oldham v. State*, 977 S.W.2d 354, 360 (Tex.Crim.App.1998). Counsel is right that many claims of ineffective assistance of counsel cannot be proven without testimony by the trial counsel about why he did or did not do certain things. *See Toney v. State*, 783 S.W.2d 740, 742–43 (Tex. App.—El Paso 1990, pet. ref'd) This can only be done through a motion for new trial or a writ of habeas corpus filed after the appeal. But, under our current system, if appellate counsel cannot obtain the testimony of trial counsel for a motion for new trial, or needs a complete transcription of the trial to develop trial counsel error, the defendant's only means of attacking the representation is by writ of habeas corpus. *See Oldham*, 977 S.W.2d at 360 (stating that the court of appeals may not abate for an out of time motion for new trial held for the purpose of developing a record on appeal.).

10. McCain raised 13 alleged problems with the testimony; however, he did not cite any authority in support of some of the alleged problem areas. There was also some overlap in the complaints, and, as a result, we are addressing only the four areas that are supported by some authority.

3) the girlfriend's testimony about the impact of the incident on her life; and 4) Mr. Tatar's testimony about Scott's academic accomplishments and his involvement in school and community activities.

Our discussion is guided by article 37.07, section 3(a) of the Code of Criminal Procedure, which governs evidence introduced at the punishment phase of the trial. *See* TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (Vernon Supp.1995). The relevant portion of article 37.07, section 3(a) states,

> Regardless of the plea and whether the punishment be assessed by the judge or the jury, the evidence may be offered by the state and defendant *as to any matter the court deems relevant to sentencing, including* but not limited to ... *the circumstances of the offense for which he is being tried. . . .*

*Id.* (emphasis added). As to each of the three issues raised in McCain's brief, the question is whether the testimony was relevant to sentencing, and specifically relevant to the circumstances of the offense. *See Brooks v. State,* 961 S.W.2d 396, 397–401 (Tex.App.—Houston [1st Dist.] 1997, no pet.).

■ We turn first to Mr. Tatar's testimony. McCain cites us to a concurring opinion for the proposition that Mr. Tatar could not testify about the trauma he and his family experienced as a result of the murder of his son. *See, e.g., Stavinoha v. State,* 808 S.W.2d 76, 80 (Tex.Crim.App. 1991). However, recently, courts have allowed this type of testimony.

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individ-

ual whose death represents a unique loss to society and in particular to his family."

> . . . .

> ... A state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Payne v. Tennessee,* 501 U.S. 808, 825–27, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

■ Texas has concluded that this evidence is relevant. *See Stavinoha,* 808 S.W.2d at 79. For example, in *Stavinoha,* the very case McCain cites, the majority held that evidence of the mother's emotional injury was admissible. It was closely linked to the circumstances of the offense, in that the mother's own actions enabled the defendant to commit the crime by entrusting her son with a priest who then molested the child. *See id.* As the *Stavinoha* court noted, this type of testimony is admissible "so long as that evidence 'has some bearing on the defendant's 'personal responsibility and moral guilt.'" *Id.* In connection with the testimony of the psychological trauma to the mother and son in *Stavinoha,* the court held that a "jury could rationally hold appellant morally accountable for the psychological trauma to both complainant and his mother, and for the consequences of that trauma." *Id.* Noting that the priest knew his parishioners well, and knew their vulnerabilities, "[h]e could easily have anticipated the impact his betrayal of trust would have on both mother and child." *Id.*

In addition, other courts, in both capital and non-capital cases, have held that evidence of a close relative's emotional scarring was admissible. *See McDuff v. State,* 939 S.W.2d 607, 620 (Tex.Crim.App.1997); *Ford v. State,* 919 S.W.2d 107, 115–16 (Tex.Crim.App.1996); *Brooks,* 961 S.W.2d

at 400–01;[11] *Brown v. State*, 875 S.W.2d 38, 39–40 (Tex.App.—Austin 1994, no pet.); *Peoples v. State*, 874 S.W.2d 804, 807 (Tex. App.—Fort Worth 1994, pet. ref'd). In *McDuff*, the Court of Criminal Appeals spoke of how the crime's effect on the deceased's sister was "certainly foreseeable." *McDuff*, 939 S.W.2d at 620. The court held that the trial court did not abuse its discretion in admitting testimony by the sister of her sense of loss and her fears of going out by herself after her sister's death. *See id.* And, the court also refused to disturb the trial court's decision to let the sister testify about how the tragedy caused the breakup of her marriage.[12] In short, these recent cases clearly support the introduction of Mr. Tatar's testimony about the impact of Scott's murder on him and his family.

 We reach a similar conclusion regarding the testimony of Nicole Meyer, Scott Tatar's girlfriend, in which she related her injuries from the shooting. Although McCain argues that this sort of testimony is impermissible because she was neither the complainant nor a relative of the victim, at least one other court has held that this type of testimony is admissible. *See Fleming v. State*, 956 S.W.2d 620, 623–24 (Tex.App.—Eastland 1997, pet. ref'd) (holding that the trial court did not abuse its discretion in allowing a mother and daughter, who were shot along with the deceased, to testify about their injuries). We agree with the *Fleming* court. This sort of testimony is relevant to the circumstances of the incident. As we discussed in connection to the father's testimony, relatives of the deceased are able to testify about how the death of their loved

one impacted them. They are able to do this because the crime's effect on the relative is "certainly foreseeable." *See McDuff*, 939 S.W.2d at 620. If the crime's effect on a relative is foreseeable, then certainly, the crime's effect is no less foreseeable on a person who was injured by the same volley of shots that killed the deceased.[13] In addition, as in *Stavinoha*, the jury could rationally hold McCain morally responsible for the injuries Meyer suffered. *See Stavinoha*, 808 S.W.2d at 79. In short, we conclude that Nicole's testimony of her injuries was relevant and admissible, and McCain's counsel was not deficient in his representation for failing to object to it.

In the same manner that Nicole's injuries were relevant, also relevant is Nicole's testimony about how the incident impacted her life. She testified generally that her hand would never be the same, that she moved back to Iowa because she was frequently reminded of the attack by how people treated her and questions they asked, and that she was much more emotional and scared than before the attack. This testimony is not unlike the testimony of relatives who have testified how the deaths of their loved ones affected them. *See McDuff*, 939 S.W.2d at 620; *Brooks*, 961 S.W.2d at 397–98. Here, again, a jury could rationally hold McCain morally responsible for the emotional trauma his and his friend's deadly actions would have on the people in the car. We find the testimony admissible, and conclude that McCain's lawyer was not ineffective for failing to object to it.

 Finally, we turn to the fourth area of complaint, Mr. Tatar's testimony about

---

11. *Brooks* contains an excellent discussion of the trend, in both capital and non-capital cases, to allow victim impact testimony, including the testimony of those not named as the complainant who, nonetheless, are foreseeable victims of the defendant's actions. *See Brooks*, 961 S.W.2d at 398–401.

12. The court noted that this testimony was more tenuously related and more questiona-

ble, but, nonetheless, let the trial court's decision stand. *See McDuff*, 939 S.W.2d at 620.

13. Here we have one victim testifying how she was injured physically and emotionally. Our conclusion as to admissibility might be different if a number of people were shot—for example, if the defendant shot a busload of people—and the State wanted each of them to give victim impact testimony.

Scott's academic accomplishments and his school and community involvement. Under the existing case law, this testimony clearly is inadmissible.

> As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind—for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead *each* victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be.

*Payne,* 501 U.S. at 823, 111 S.Ct. 2597, 115 L.Ed.2d 720. When this trial occurred, the law in Texas unquestionably was that victim character evidence might be admissible in a rebuttal context, but otherwise, was inadmissable to the extent that it was not directly related to the circumstances of the offense. *See Smith v. State,* 919 S.W.2d 96, 102 (Tex.Crim.App.1996). This past year the court broadened somewhat the use of victim character evidence, announcing a rule it intended the courts of this state to follow in determining the admissibility of victim character evidence. *See Mosley v. State,* 983 S.W.2d 249, 261–64 (Tex.Crim.App.1998) (questioning the rule of *Smith* ). The court held that

> victim character evidence [is] admissible, in the context of the mitigation special issue, to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence.... When the focus of the evidence shifts from humanizing the victim and illustrating the harm caused by the defendant to measuring the worth of the victim compared to other members of society then the State exceeds the bounds of permissible testimony.

*Id.* at 262. Here the evidence meets none of the criteria listed by either *Smith* or *Mosley.* It was not introduced in a capital murder case in connection with the mitigation special issue, see Tex.Code Crim. Proc. Ann. art. 37.071, § 2(d) (Vernon Supp. 1999), it was not admitted in a rebuttal context, and it went beyond humanizing the victim and illustrating the harm caused by the defendant to measuring the worth of the victim compared to other members of society. *See Mosley,* 983 S.W.2d at 262. In short, had McCain's counsel objected, the testimony should not have been admitted into evidence.

The testimony was not long—one page worth of testimony out of a total of nine pages of testimony by his father. But, through this testimony, the jury heard that Scott was fifth in his class of 300, a member of the national honor society, co-captain of the tennis team, active in the school band and a member of the science club; it learned that he was a teacher's aide for the Sacred Heart CCU program, participated in Special Olympics, and helped at the George Foundation Museum at Christmastime.

▮ By allowing this testimony to come in without objection, counsel's performance was deficient. The question then becomes whether, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. To answer this question, once again, we must consider the record as a whole. *See id.* at 695, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. When we do that, we are confronted with several undeniable facts. First, the evidence was overwhelming that McCain, his brother, and Chris Bench, chased after the blue Neon and shot at it. And, they did not just shoot at it once or twice. They apparently shot 16 times. The victims in the car testified that they saw McCain shooting directly at Scott Tatar. In addition, the jury already knew that these were innocent, young victims. On top of this overwhelming evidence, including McCain's own admission that he shot at the car, McCain refused to accept any responsibility for Scott Tatar's death and failed to

show any regret or sorrow for the death he clearly had a part in causing.

The prosecutor briefly mentioned Scott's good character in closing; however, he truly only mentioned it. The entire reference is only six lines out of a total of 380 lines of argument. It also is in the middle of the argument—not at the very beginning, not at the very end. Finally, and most importantly, the prosecutor did not rely on Scott's good character to urge the jury to give life. Instead, he focused on the very things we have discussed in this opinion that made Jody McCain so unbelievable and despicable. The prosecutor reminded the jury how remorseless McCain was and how McCain seemed incapable of taking responsibility for his role in Scott's death. As the prosecutor pointed out, McCain denied responsibility to the end. In fact, McCain's last words to the jury, after it had already found him guilty, and shortly before the jury convened to assess punishment were, "I didn't shoot Scott." The prosecutor also pointedly reminded the jury of how McCain characterized his deadly actions as a "mistake." The prosecutor then compared this statement to testimony by Nicole Meyer in which she told McCain's lawyer that the shooting could not be described as a mistake—it was murder.[14] The prosecutor's argument was compelling and convincing. The argument of McCain's lawyer was not as convincing. He tried to make the jury

feel some compassion for McCain, but, after all that had gone before, it was not as compelling as the prosecutor's argument for life.

Thus, even though the prosecutor referred briefly in his closing to Scott Tatar's good character, we conclude that the jury still would have given McCain life, even if this testimony had not been admitted. Here, the lawyer's substandard performance did not produce a different outcome than would have occurred had the lawyer objected to the improper testimony.

**6. The failure to object to the absence of the mandatory parole instruction.**

We now turn to the sixth category of potential error alleged by McCain, where he alleges that his counsel was ineffective for not objecting to the absence of the mandatory parole instruction.[15] In support of this claim, McCain cites us to *Kucel v. State*, 907 S.W.2d 890, 896 (Tex. App.—Houston [1 st Dist.] 1995, pet. ref'd). In *Kucel*, the charge originally contained the correct language regarding parole, including that the defendant would have to serve one-fourth of the sentence imposed or 15 years, whichever was less. *See id.* However, in his closing argument, counsel for Kucel told the jury that he would serve a minimum of one-fourth of his sentence or *two* years, whichever was less. *See id.* After this statement, the charge was changed, at counsel's acquiescence, and counsel told the jury that the charge con-

---

14. At the punishment hearing shortly before the jury deliberated McCain's punishment, McCain's lawyer tried to get Nicole Meyer to characterize McCain's actions as a mistake. Her response hurt McCain.

Q: Ms. Meyer, if you had made a mistake, would you want a second chance?
A: I haven't killed anybody.
Q: But if you had just made a mistake?
A: That is not a mistake. If you have a gun in your hand, you're not trying to just scare somebody.
Q: That's not exactly what I'm asking. I'm not [sic] talking about a really colossal mistake.
A: Well, there's a big difference in that. I'm not talking about staying out too late or something, this is murder.

Q: So it's a matter, to you it's a matter of how bad the mistake is?
A: There's a big difference between death and something that just happens, because you're, you know, staying out too late or disobeying your parents, you know.

15. This is the same instruction we addressed in point of error two. As we explained there, instead of giving the jury the rather long instruction explaining that a prisoner may have to spend at least half of his sentence in prison without consideration of any good conduct time and that good conduct time can be taken away. In this charge, the jury also is told not to consider how the parole law might be applied to the defendant.

tained a mistake that the judge would correct in pen. *See id.* For three reasons, *Kucel* is not dispositive of this case.

To begin with, *Kucel* was written before the recent *Hernandez* case, in which the Court of Criminal Appeals held that *Strickland* applies to the punishment phase of trial. *See Hernandez,* 988 S.W.2d at 770–71. *Kucel* applied *Ex parte Duffy;* we are to apply *Strickland. See id.* Second, during deliberations, the jury in *Kucel* sent a note to the judge indicating that it was trying to consider the parole law so that it could maximize the defendant's time in prison. *See Kucel,* 907 S.W.2d at 897. We do not have that problem in this case. This jury was told not to discuss among themselves how long the defendant would be required to serve his sentence, if any, and that considerations of this nature were within the exclusive province of the Board of Pardons and Paroles and "must not be considered by you."

Third, as we have said before, although the instruction used in this case is not the instruction in the statute, it did one important thing: it told the jury not to consider how much of his sentence McCain would serve. There is nothing in this record, as in *Kucel,* to show that the jury was improperly considering the parole laws. *See id.* More importantly, this jury was told in no uncertain terms, that it should under no circumstances, consider the application of the parole law. We are to presume that the jury followed the court's instruction. *See Eldridge,* 940 S.W.2d at 650. If the jury followed this instruction, McCain could not have been harmed. As a result, we conclude that counsel's performance was not substandard because he failed to object to the omission of the statutory instruction.

## III. CONCLUSION

In conclusion, having found each of McCain's complaints to be without merit, we overrule McCain's third point of error and, accordingly, we affirm.