Opinion issued March 23, 2006












     





In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00410-CR




CHELCE A. WHITE, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 23rd District Court
Brazoria County, Texas
Trial Court Cause No. 42,320




MEMORANDUM OPINION
          Appellant, Chelce A. White, was charged with murder. The indictment
contained two enhancement paragraphs alleging prior convictions for attempted bank
robbery. A jury found appellant guilty as charged in the indictment and assessed
punishment at confinement for life and a $10,000 fine. In six points of error,
appellant contends that the trial court erred by (1) admitting mitochondrial DNA
evidence, (2) admitting a tape recording made from the victim’s voice mail because
it had been altered, (3) admitting a tape recording made from the complainant’s voice
mail because its probative value was outweighed by its risk of unfair prejudice, (4)
denying appellant the right to admit checks that he contends were necessary to show
the bias or interest of a State’s witness, and (5) refusing to submit appellant’s
requested jury charge on venue. Appellant also contends that (6) the evidence is
insufficient to establish venue in Brazoria County. We affirm.
BACKGROUND
          Appellant was married to the complainant, Sonya White. During the latter part
of 2000, Sonya left appellant and moved to Texas with their son, Chase. In October
2001, Sonya’s mother, Annie Tawbush, moved in with Sonya in a mobile home in
League City, Texas. 
          Sonya was a school bus driver for Clear Creek Independent School District. 
She had a morning, midday, and afternoon run that she made each weekday. On
February 25, 2005, Sandra Dudley, a dispatcher, saw Sonya after her midday run,
when Sonya clocked out at 12:13 p.m. Dudley testified that nothing appeared to be
wrong at the time and she expected Sonya to clock back in at about 2:00 for her
afternoon run. However, Sonya never returned for her afternoon run. Joyce
Childress, who also worked for the school district, testified that Sonya was a model
employee and Childress was very surprised when Sonya did not return for her
afternoon run.
          Sonya’s mother, Annie Tawbush, testified that Sonya would usually come
home from work at around 5:30 p.m. However, on February 25, 2002, Sonya did not
come home at all. At around 7:00 p.m., Tawbush and Christine Chappuis, Sonya’s
best friend, began looking for Sonya. They drove by the house/office owned by
appellant’s boss, Leslie Wacasey, at around 7:30 p.m., but appellant’s truck was not
there. They drove by Wacasey’s house again at 8:30 p.m. and waited for an hour. 
Again, appellant’s truck was not there. Tawbush eventually called the police that
evening and reported Sonya as missing.
          The next day, February 26, Tawbush and Chappuis confronted appellant and
asked him where Sonya was. Appellant told them that he did not know what they
were talking about and said he did not know where Sonya was. Chappuis checked
the messages on Sonya’s voice mail and discovered that appellant had left a message
for Sonya at 10:40 a.m. on February 25 asking her to have lunch with him.
          Also on February 26, Officer M. Grant of the League City Police Department
conducted a videotaped interview of appellant. Appellant gave his address as 2112
Smith Lane, which was actually the home/office of his employer, Wacasey. He stated
that he was going to meet Sonya for lunch on February 25. He flagged Sonya down
in a Kroger parking lot and told her that he was not going to be able to make it to
lunch because he was sick. He said that he looked at a photo album that she had in
her car, and then Sonya left. Appellant claimed that he did not return to work, but
“hung out” at the office at Smith Lane for the rest of the day. He said that he and
Sonya were friends and that he had recently paid to get her car back after it had been
repossessed.
          On Saturday after Sonya disappeared, her mother and aunt again confronted
appellant. Tawbush cried, got down on her knees and begged appellant to tell her
what he had done with Sonya. He replied, “I wish I could bring her back.”
          About one week after Sonya’s disappearance, Dana Powell, with whom Sonya
had had a relationship, and his father met appellant at the Kettle Restaurant. 
Appellant told Powell that he and Sonya had an open marriage and that they could
sleep with whomever they wished. He also said derogatory things about Sonya. 
Appellant told Powell that, if Powell knew where Sonya was, he would like for him
to bring her back.
          Timothy Miller, of Texas Equusearch, was involved in the search for Sonya
White. Miller testified that appellant came by his office and asked how the search
was going and what areas had been searched. Appellant told Miller that he met
Sonya in a parking lot on February 25. He said that he got in the car on the passenger
side to look at pictures. He saw pictures of her with another man and became upset. 
He later said that he walked up to the drivers’ window to talk to Sonya. When Miller
confronted appellant with the inconsistency in his story, appellant got confused. 
Later, he told Miller, “If anybody knew her double lifestyle, nobody would be
searching for her.” Appellant called Sonya a high-dollar whore and claimed that he
had paid a private detective $4,600 to find her. Appellant told Miller that he saw
Sonya drive west on Nasa Road One toward Highway 45. When Miller told him that
there might be surveillance cameras in that area, appellant changed his story, stating
that he was not sure Sonya went down Nasa Road One. When Miller told him that
Sonya would probably show up on the surveillance cameras anyway, appellant
became concerned and acted nervous. Miller stated that appellant never helped
search for Sonya.
          Officer Grant testified that Sonya’s car was later recovered from the parking
lot at Baybrook Mall. A photo album was in the front seat of the car. On March 4, 
Officer Grant conducted another videotaped interview of appellant. During this
interview, appellant stated that, after cancelling his lunch with Sonya, he left the
office at Smith Lane at around 3:20 p.m. to go to the grocery store to buy grapes. He
went back to Smith Lane around 3:40 p.m. and then went to Barney’s Pool Place, but
did not go in. He then claimed that he went to Clear Lake Shores to look at rent
houses and did not get home until around 8:30 p.m. Appellant never mentioned that
he had been renting an apartment at the Extended Stay America Hotel on Nasa Road
One.
          On March 6, Greg Guthrie testified that he found a body just off County Road
210 in Brazoria County and called the police. Patrol Lieutenant D. Ricks and
Lieutenant C. Parmiter of the Brazoria County Sheriff’s Department responded to the
dispatch regarding Guthrie’s discovery of the body. The officers had to walk through
knee deep water to get to the body. Parmiter fingerprinted the body, later identified
as that of Sonya White, and collected evidence from the scene. Among the items
recovered from the scene was a receipt from a Kentucky Fried Chicken restaurant on
Nasa Road One, near the Extended Stay America Hotel.
          Also on March 6, Lieutenant S. Ricks of the Brazoria County Sheriff’s Office
conducted a third videotaped interview of appellant. On the video, appellant stated
that he and Sonya had separated. When she moved from Alabama to Texas, he
followed her. He had hired an investigator to find her. He said that Sonya no longer
wanted a divorce, but he did. He said that he gave her money to get her repossessed
car back. He said that they were both dating other people, which was fine with him. 
He had asked her to go out with him on New Years’ Eve, but she already had other
plans. Appellant admitted that, at one point in the divorce proceedings, he told the
judge that he no longer wanted a divorce. During the interview, appellant said that
on the day Sonya disappeared, they met for lunch in a parking lot at 12:30 p.m., but
that he could not eat because he was sick. They visited briefly and Sonya left. He
went back to his office, arriving there at 1:15 p.m. He told someone at his office that
he was sick, cleaned his truck, and went to Randall’s to get grapes. Appellant also
told Lieutenant Ricks that he had stomach cancer. Appellant said that he drove
around from 7:30 to 8:00 p.m. on February 25 looking for rental property. On
February 26, he moved his stuff from Extended Stay America Hotel to Wacasey’s
house because “he didn’t need it anymore with Sonya being missing.”
          On March 8, the Brazoria County Crime Scene Unit was dispatched to room
333 of the Extended Stay Hotel on Nasa Road One. Appellant had checked into the
room on January 11, 2002, and had check out on February 27, 2002, two days after
Sonya disappeared. He was not scheduled to check out that day, so he was given a
refund in the amount of $136. He left many personal items in his room, including
jeans, boots, wine glasses, a nightgown, and a box of chocolates. The jeans were
dirty and brownish red from the knee down and the boots were muddy. Judy
Cienfuegos, a general manager for Extended Stay America Hotels, testified that
appellant seemed nervous when he checked out. He was pale, in a hurry, and told her
that he had to take care of some business. He told her that he had taken what he could
out of his room and that the hotel could have what was left. The hotel stored the
property for 30 days, but Cienfuegos did not know what happened to it after that. 
Lieutenant Ricks requested that the items be turned over to the Sheriff’s Department,
but the items could not be found.
          When Lieutenant Parmiter searched room 333, she found that the carpet,
padding, concrete under the padding, and a red stain on the wall tested presumptively
positive for the presence of blood. Samples taken from these locations were collected
and sent to the University of North Texas DNA Laboratory for testing. Parmiter
testified that the stain on the carpet indicated the loss of a large amount of blood. 
Someone had attempted to clean the spot on the carpet.
          Also on March 6, T. Murphy, a crime scene investigator with the League City
Police Department, was dispatched to conduct a search of 2112 Smith Lane, which
she did with the consent of the owner, Leslie Wacasey. Wacasey testified that
appellant asked to stay at his house shortly after Sonya disappeared. Wacasey
allowed appellant to move his belongings upstairs in one of the bedrooms, but
appellant slept downstairs. On February 25, the day Sonya disappeared, appellant
worked only until about 11:00 or noon. Wacasey did not see appellant for the rest of
the day or that night at his house. Appellant told Wacasey that, if anyone asked, tell
them that appellant had been staying at his house “for a while.” When appellant left,
he told Wacasey that he did not know if he was coming back. He told Wacasey, “take
my truck if I don’t come back.” Wacasey testified that appellant’s clothes were kept
in the same closet as Wacasey’s vacuum cleaner. Wacasey testified that he had not
used his vacuum cleaner in the six to eight months that he had lived in the house. 
When crime scene investigator Murphy examined the vacuum cleaner, she found long
blonde hairs in it. These hairs were recovered and submitted to the University of
North Texas DNA Laboratory for testing.
          At trial, John Plantz, the associate director of the laboratory at the University
of North Texas testified about the difference between mitochondrial DNA testing and
nuclear DNA testing. Mitochondrial DNA testing is used when there is a very limited
amount of biological material available for sampling.
          Christina Capt, a forensic DNA analyst, testified that she extracted a significant
amount of DNA from the stained carpet, the carpet pad, the sheet rock, and the
concrete recovered from room 333. All of these items, upon which nuclear DNA
testing was conducted, matched the DNA profile of Sonya White. The probabilities
of a random match for all but the sample from the concrete were 1 in 49.7 quadrillion. 
The probabilities of a random match for the sample from the concrete was about one
half that because of dirt contamination. Capt also testified that she extracted DNA
from the hair samples recovered from the vacuum cleaner, which she passed on to a
co-worker for mitochondrial DNA analysis.
          Amy Smutz compared the mitochondrial DNA from the hair samples to the hair
of Sonya White. The DNA matched. Smutz testified that this particular DNA profile
matched only 3 out of 1674 caucasions contained in the FBI mitochondrial DNA
database.
          Appellant testified on his own behalf at trial. Appellant testified that, even
though he and Sonya had filed for divorce in September 2001, they continued to be
friends and to have sexual relations after the divorce was filed. He said that he paid
her $7500 to get her car back after it had been repossessed. He claimed that, in
January 2002, they were talking to one another every day. He said that he moved into
the Extended Stay America Hotel from January 11 to February 26. He said that
Sonya spent the night over there on several occasions. Sometimes, she spent the
night there without him. Appellant testified that Sonya paid one half the bill for the
hotel room. He admitted meeting Sonya on February 25 in the Kroger parking lot,
but claimed that he told her that he could not have lunch with her because he was not
feeling well. He said that he saw a negligee in the room on February 22, but that he
did not put it there. He did not see any blood on the carpet, but stated that Sonya had
cut her thumb.
          On cross-examination, appellant admitted that the Kentucky Fried Chicken
receipt, which was found near Sonya’s body, came from the restaurant near his hotel.
He admitted that he lied when he told police that he hired a private investigator to
find Sonya and when he claimed to have stomach cancer. He admitted that the money
he gave Sonya for her car was part of an itemized account from their separation. He
admitted that he never told police that Sonya paid one half the bill for the hotel room. 
He also admitted that he did not initially tell police that he had been staying at the
Extended Stay America Hotel. He admitted calling Sonya multiple times late at night
the day before she disappeared. He also claimed that Wacasey was wrong when he
said that appellant had not spent the night at his house before February 26, 2002.
          After hearing all the evidence, the jury convicted appellant of Sonya’s murder
and this appeal followed.
Mitochondrial DNA
          In point of error one, appellant contends the trial court erred by admitting
evidence of the mitochondrial DNA match of Sonya’s hair with the hairs recovered
from the vacuum cleaner at Wacasey’s house. Specifically, appellant claims that the
mitochondrial DNA evidence was not shown to be reliable under the standards set
forth in Daubert v. Merrell Dow Pharms., Inc., 113 S. Ct. 2786 (1993) and Kelly v.
State, 824 S.W.2d 568, 572-73 (Tex. Crim. App. 1992).
          However, the evidence also showed that nuclear DNA evidence was recovered
from the carpet, carpet padding, cement floor, and walls of appellant’s hotel room,
and that the nuclear DNA samples taken from these sources matched samples taken
from Sonya. The probability of a random match for the nuclear DNA samples was
1 in 49.7 quadrillion. This nuclear DNA evidence was not challenged on appeal, and
its admission, in our opinion, renders the admission of the mitochondrial DNA
evidence harmless error, if error at all. See Tex. R. App. P. 44.2(b).
          Accordingly, we overrule point of error one.
The Voice Mail Recordings
          At trial, the trial court introduced State’s exhibit 285, an audiotape of Sonya’s
voice-mail messages, through the testimony of Christine Chappuis. The tape was
made by Lieutenant Ricks from a cellular phone provided by Chappuis, who knew
Sonya’s PIN number. In two points of error, appellant challenges the admission of
this tape. The standard of review for a trial court’s ruling under the rules of evidence
is abuse of discretion. Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).
          Admissibility under Texas Rule of Evidence 901(a)
          In point of error two, appellant contends that the audio tape was not admissible
under rule 901(a)


 of the Texas Rules of Evidence because it had been altered. 
Specifically, appellant contends that, even though the tape was accurate at the time
Lieutenant Ricks made it, the voice messaging service from which it was retrieved
had been altered earlier when Chappuis erased her own messages, which she had left
on Sonya’s voice mail when attempting to locate her.
          The authentication requirement of rule 901 is satisfied by evidence sufficient
to support a finding that the matter in question is what its proponent claims. Angleton
v. State, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998); Tex. R. Evid. 901(a)).
          The State correctly points out that the audiotape that was entered into evidence
is a single tape containing a series of separate and distinct voice messages left by
different people at different times. The deletion of some of these separate
messages—the nine messages Chappuis left for Sonya while looking for her—does
not mean that the other remaining messages had been altered. Chappuis was able to
identify each of the voices in the remaining messages, and the recording of those
messages did not appear altered or changed in any way when recorded by Lieutenant
Ricks.
          Even if we were to consider the messages left on the voice mail as a single
event, we would still conclude that the tape was admissible because the deletions of
Chappuis’s messages did not affect the reliability of the remaining messages on the
tape. “If the alteration is accidental and is sufficiently explained so that its presence
does not affect the reliability and the trustworthiness of the evidence, the recording
can still be admitted.” Maldonado v.State, 998 S.W.2d 239, 245 (Tex. Crim. App.
1999). In this case, Chappuis explained that she erased her own messages because
she knew that the voice-mail would only hold 20 messages and she wanted to
preserve space in the voice mail box. The deletion of Chappuis’s own messages did
not change the reliability of the other messages left on Sonya’s voice mail.
          Accordingly, we overrule point of error two.
          In point of error three, appellant contends that the audiotape of Sonya’s voice-
mail messages was inadmissible under rules 402, 801, and 403 of the Texas Rules of
Evidence. A point of error that contains more than one specific ground of error is a
multifarious point of error, and we could refuse to consider it. See Marcum v. State,
983 S.W.2d 762, 767 n.1 (Tex. App.—Houston [14 th Dist.] 1998, pet. ref’d) (citing
Bell v. Texas Dept. of Criminal Justice--Institutional Div., 962 S.W.2d 156, 157 n.1
(Tex. App.—Houston [14th Dist.] 1998, no pet.)). However, a court may consider
multifarious points of error if the court can determine, with reasonable certainty, the
alleged error about which the complaint is made. McCain v. State, 995 S.W.2d 229,
243 n.7 (Tex. App.—Houston [14th Dist.] 1999, pet. ref’d, untimely filed). As we are
able to determine the errors about which appellant complains, we will, in the interest
of justice, consider those complaints.
          Admissibility under Texas Rules of Evidence 801 and 402
          State’s exhibit 285 contained 14 separate messages retrieved from Sonya’s
voice-mail—three from appellant; six from Sonya’s mother, Annie Tawbush; one
from Johnny Caballero; one from Sonya’s stepfather, Joe Tawbush; one from Sonya’s
aunt, Darlene Bright; one from Sonya’s son, Chase; and one unidentified caller. On
appeal, appellant specifically complains about the following messages:
[Stepfather, Joe Tawbush]: If your phone’s off or, you know, give me a
holler. If Chelce is there with you, he better pray to the good Lord that
I don’t get to him first.
 
[Mother, Annie Tawbush]: Hey, Sonya. I just talked to the police again. 
They’ve got everything working. They’ve got Chelce’s driver’s license
number and social security number and they know all about it. So, if
there is any way you can call, call me. I love you. Bye.
 
[Mother, Annie Tawbush]: Hey, Sonya. This is your mother. I don’t
know what to say except I truly wish you’d call. I know Chase [Sonya’s
son] sure did hate to go to bed without seeing his mama tonight. I know
if there was some way you could call me tonight, you would call and let
me know something. I love you. Bye.
 
[Son, Chase White]: Mommy, I love you. I want you to come home. I
miss you. Call me. Bye.

          Appellant argues that the telephone messages were inadmissible hearsay. We
disagree. “Hearsay” is a statement, other than one made by a declarant while
testifying at trial, offered in evidence to prove the truth of the matter asserted. Tex.
R. Evid. 801(d). The State argues that the messages are not hearsay because they
were not offered for the truth of the matter asserted therein. Instead, the State argues
that the messages were offered merely to show that the calls had been made and to
suggest that Sonya, had she been able, would have responded to these frantic calls
from her friends and family. As such, the State argues that the messages are relevant
to establishing Sonya’s time of death.
          We agree that the messages were not offered to prove the truth of the matters
asserted therein. For example, the message from Chase was not admitted to prove
that Chase really loved Sonya and wanted her to come home. Instead, it was offered
by the State to suggest that, if Sonya had been able, she would have returned her
son’s call. Similarly, the message from Annie Tawbush about the police having
appellant’s driver’s license was not offered to prove that the police were actually in
possession of the driver’s license, but was offered to show that Tawbush was still
trying to locate Sonya even after calling in the police and to suggest that Sonya, had
she been able, would have returned her mother’s call and told her that calling in the
police was unnecessary. Because the messages were not offered for the truth of the
matters asserted therein, the trial court did not err in ruling that they were not hearsay,
as that term is defined in rule 801.
          For the same reason that the messages were not hearsay under rule 801, they
were relevant under rule 401, which defines relevant evidence as that which has a
tendency to make more or less probable a fact of consequence in the case. As
discussed above, the messages have a tendency to make it more probable that Sonya
was already dead by the time her family started making phone calls to her looking for
her because the messages her family left are the type of messages that she would have
returned, if able. Because the messages assist the jury in to establishing the time of
Sonya’s death, they are relevant under rule 401.
          Admissibility under Texas Rules of Evidence 403
          Appellant also contends that the voice mail messages should have been
excluded under rule 403 of the Texas Rules of Evidence because their probative value
was outweighed by the risk of unfair prejudice. Rule 403 provides as follows:
Although relevant, evidence may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice, confusion of
the issues, or misleading the jury, or by considerations of undue delay,
or needless presentation of cumulative evidence.

Tex. R. Evid. 403. Only “unfair” prejudice provides the basis for exclusion of
relevant evidence. Montgomery v. State, 810 S.W.2d 372, 389 (Tex. Crim. App.
1991) (op. on reh’g). Unfair prejudice arises from evidence that has an undue
tendency to suggest that a decision be made on an improper basis, commonly an
emotional one. Id. at 388. Rule 403 favors admissibility and a presumption exists
that relevant evidence will be more probative than prejudicial. Id.; DeLeon v. State,
77 S.W.3d 300, 315 (Tex. App.—Austin 2001, pet. ref’d). In evaluating the trial
court’s determination under rule 403, a reviewing court is to reverse the trial court’s
judgment “rarely and only after a clear abuse of discretion.” Mozon v. State, 991
S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting United States v. Maggitt, 784 F.2d
590, 597 (5th Cir. 1986). The standard recognizes that the trial court is in a superior
position to gauge the impact of the relevant evidence. Montgomery, 810 S.W.2d at
391, 392.
          To determine whether the prejudicial value of the proffered evidence
substantially outweighs its probative value, a reviewing court may consider (1) how
compellingly the evidence services to make a fact of consequence more or less
probable; (2) the potential the evidence has to impress the jury in some irrational but
indelible way; (3) the time the proponent will need to develop the evidence; and (4)
the force of the proponent’s need for this evidence to prove a fact of consequence. 
Mozon, 991 S.W.2d at 846-47.
          We have already discussed the State’s need for the voice-mail evidence in our
discussion of point of error two. The State used the evidence to show the context of 
the search for Sonya and to narrow the time frame for her death. Appellant argues
that this need was outweighed by the risk of prejudice caused by the “accusatorial”
nature of some of the messages. Appellant further argues that the message from
Sonya’s son and mother were used “solely to elicit sympathy and show the emotion
of a worried mother and son.”
          We cannot conclude that the jury would be impressed “in some irrational but
indelible way” by reason of the voice mails suggesting that Sonya’s parents suspected
appellant. Tawbush and Chappuis had already testified that they suspected appellant
and had confronted him about Sonya’s disappearance. The voice mails were in no
way more damaging to appellant than this testimony. Regarding the sympathy
created in the jury by hearing the voice mails, we note that Tawbush had testified that
she cried and begged appellant to tell her what he had done with Sonya. Again, the
voice mails—even the voice mail from Sonya’s son—were not more damaging than
this testimony. 
          Based on the record before us, we cannot conclude that the trial court abused
its discretion in concluding that the probative value of the voice mails was not
“substantially outweighed” by the danger of unfair prejudice.
          Because we hold that the trial court properly admitted the evidence of the
voice-mail messages under rules 402, 801, and 403 of the Texas Rules of Evidence,
we overrule issue three.
Denial of Impeachment Evidence
          In point of error four, appellant contends that the trial court erred by refusing
to admit defense exhibit 17, which consisted of several checks that Chappuis wrote
to herself out of a trust account that had been set up for Sonya’s family during the
time thatSonya was missing. Appellant argued that the evidence was necessary to
impeach Chappuis for bias or prejudice. We review the trial court’s ruling for an
abuse of discretion. Guzman, 955 S.W.2d at 89.
          Rule 613(b) of the Texas Rules of Evidence provides as follows:
Examining Witness Concerning Bias or Interest. In impeaching a
witness by proof of circumstances or statements showing bias or interest
on the part of such witness, and before further cross-examination
concerning, or extrinsic evidence of, such bias or interest may be
allowed, the circumstances supporting such claim or the details of such
statement, including the contents and where, when and to whom made,
must be made known to the witness, and the witness must be given an
opportunity to explain or to deny such circumstances or statement. If
written, the writing need not be shown to the witness at that time, but on
request the same shall be shown to opposing counsel. If the witness
unequivocally admits such bias or interest, extrinsic evidence of same
shall not be admitted. A party shall be permitted to present evidence
rebutting any evidence impeaching one of said party’s witnesses on
grounds of bias or interest.

Tex. R. Evid. 613(b) (emphasis added).
          In this case, Chappuis admitted to writing the checks to herself out of the trust
account and explained that she did so to reimburse herself for telephone bills and lot
rent on Sonya’s trailer. Appellant was able to extensively cross-examine Chappuis
about the checks. Appellant does not offer any explanation to show how the actual
checks were necessary to impeach Chappuis.
          Because Chappuis unequivocally admitted to writing the checks and appellant
offers no explanation about how the physical checks would have shown more interest
or bias than that to which Chappuis had already admitted, the trial court did not abuse
its discretion in refusing to admit defense exhibit #17 into evidence. See McGary v.
State, 750 S.W.2d 782, 787 (Tex. Crim. App. 1988); Scott v. State, 940 S.W.2d 353,
358 (Tex. App.—Dallas 1997, pet. ref’d).
          Accordingly, we overrule point of error four.
Venue
          The indictment in this case alleged that appellant “ . . . in said County and
State, did then and there intentionally and knowingly cause the death of an individual
. . .” or that appellant “ . . . in said County and State, did then and there with intent to
cause serious bodily injury to an individual, namely, Sonya White, intentionally and
knowingly commit an act clearly dangers to human life that caused the death of Sonya
White. . . .” The phrase “Said County and State” refers to Brazoria County, Texas,
where the case was tried.
          In points of error five and six, appellant contends that (1) the evidence was
insufficient to show that appellant committed murder in Brazoria County and (2) the
trial court erred by refusing his proposed jury charge on the issue of venue.


 Appellant
argues that, because the proof shows that the murder occurred, if anywhere, in his
hotel room in Harris County, then the evidence is insufficient to show that the murder
was committed in Brazoria County, as alleged in the indictment. We disagree.
          In this case, the testimony clearly established that Sonya’s body was discovered
in Brazoria County, Texas. “If a person receives an injury in one county and dies in
another by reason of such injury, the offender may be prosecuted in the county where
the injury was received or where the death occurred, or in the county where the dead
body is found.” Tex. Code Crim. Proc. Ann. art. 13.07 (Vernon 2005) (emphasis
added); see also Washburn v. State, 692 S.W.2d 576, 577 (Tex. App.—Houston [1st
Dist.] 1985, no pet.) (holding same when murder and death occurred in same county
and body was discovered in county of prosecution). As such, venue was proper in
either Harris County, where the evidence indicates that the murder occurred or in
Brazoria County, where the body was found.
          Article 21.06 of the Texas Code of Criminal Procedure provides as follows:
When the offense may be prosecuted in either of two or more counties,
the indictment may allege the offense to have been committed in the
county where the same is prosecuted, or in any county or place where the
offense was actually committed.
 
Tex. Code Crim. Proc. Ann. art. 21.06 (Vernon 1989). Because venue was proper
in Brazoria County, article 21.06 permits the indictment to allege that the offense was
actually committed there.
          In Wilson v. State, the indictment alleged that the offense occurred in Dallas
County, but the proof showed that the offense actually occurred in Tarrant County,
within 400 feet of the Dallas County line. 825 S.W.2d 155, 158 (Tex. App.—Dallas
1992, pet. ref’d). As such, venue was proper in Dallas County, even though
committed in Tarrant County, because a county can prosecute offenses committed
within 400 feet of its border. Id. at 158 n.4. Nevertheless, appellant claimed that the
indictment did not sufficiently notify him of the crime with which he was charged
because it alleged that the crime was actually committed in Dallas County, which it
was not. Id. at 158. The court of appeals held that appellant received adequate notice
of his alleged crime because he had constructive knowledge of article 21.06 when he
was given notice of the charges against him through the indictment. Id. at 159.
          Venue is not an element of the offense of murder. See Tex. Pen. Code Ann.
§ 19.02 (Vernon 2003). To establish venue, the State need only prove by a
preponderance of the evidence that the county where the prosecution is carried on has
venue. Tex. Code Crim. Proc. Ann. art. 13.17 (Vernon 2005). The evidence in this
case is sufficient to show that the body was discovered in Brazoria County, and that,
as a result, Brazoria County had venue. Under article 21.06, appellant had
constructive knowledge that the offense was considered committed in Brazoria
County, where the body was found, even if the death occurred elsewhere.
          For these reasons, we hold that the evidence was sufficient to establish venue
in Brazoria County. Likewise, appellant’s requested instruction was properly refused
because it was an improper statement of the law.
          Accordingly, we overrule points of error five and six.
CONCLUSION
          We affirm the judgment of the trial court.
 
 
                                                             Sherry Radack
                                                             Chief Justice
 
Panel consists of Chief Justice Radack and Justices Alcala and Bland.
 
Do not publish. Tex. R. App. P. 47.2(b).