NUMBER 13-07-00270-CR



# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**ERNESTO GONZALEZ,**                                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                    **Appellee.**

---

**On appeal from the 94th District Court of Nueces County, Texas.**

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides**
**Memorandum Opinion by Justice Benavides**

A jury convicted appellant, Ernesto Gonzalez, of two counts of arson causing bodily injury, a first-degree felony. *See* TEX. PENAL CODE ANN. § 28.02(a)(2)(A), (d)(1) (Vernon Supp. 2008) ("A person commits the offense of arson if the person starts a fire . . . with the intent to destroy or damage . . . any building, habitation, or vehicle . . . ."). After the jury found an enhancement allegation "true," the trial court sentenced Gonzalez to thirty-

five years' confinement. By three issues, Gonzalez contends that the trial court should have included an accomplice witness instruction in its charge to the jury and that counsel rendered ineffective assistance. We affirm.

## I. BACKGROUND

Gonzalez was tried along with his co-defendant, Adrian Rios. This Court decided Rios's appeal on August 26, 2008. *See Rios v. State*, No. 13-07-00264-CR, 2008 Tex. App. LEXIS 6524 (Tex. App.–Corpus Christi Aug. 26, 2008, no pet.) (mem. op., not designated for publication). The record is the same for this appeal, and we will restate the facts as they appeared in our prior opinion, along with a few additional facts relevant to this appeal.

On July 15, 2006, Crystal Salinas and Jessica Sanchez visited a nightclub in Corpus Christi, Texas, where they became involved in an altercation with Rosanna Torres Juarez and Terry Garza. Afterward, Salinas and Sanchez went to their residence at 2107 Shirley Street in Corpus Christi, where they lived with Andres Ybanez, Ybanez's four siblings, Ybanez's mother, and Salinas's children. Juarez and Garza returned to Garza's house. At the time, Juarez was Rios's girlfriend, and Garza was Gonzalez's girlfriend. Gonzalez knew the Ybanez family very well and had previously resided with the Ybanezes at another address.

The following evening, Juarez borrowed her mother's truck and drove to a "game room" in Odem, Texas with Rios, Gonzalez, Garza, Angel Moreno, and Sam Rodriguez. While there, Moreno overheard Juarez, Rios, Gonzalez and Garza discussing the fight that occurred the night before. Moreno also heard Rios and Gonzalez discuss their intent

2

to "kick some guy's ass." The group returned to Garza's residence at around midnight, at which point Juarez, Garza, and Moreno entered the house while Rios, Gonzalez, and Rodriguez remained outside the house talking. At some point, Juarez took two Xanax pills. She subsequently went outside and overheard Rios, Gonzalez, and Rodriguez express their desire to "cocktail" the Ybanez house. Rios came into the house and asked to borrow keys to Juarez's mother's truck to "take care of some business." Juarez gave him the keys and then saw Rios, Gonzalez, Rodriguez, and another man, "Gordo," get into the truck and drive away.

Meanwhile, Ybanez, Ybanez's sister Dina Limon, Sanchez, and Chelsea Rudisell were returning to the Shirley Street residence in Ybanez's white Chevrolet Malibu. Ybanez was driving, Rudisell was in the front passenger seat, and Limon and Sanchez were in the rear passenger seats. As Ybanez pulled into the driveway of the Shirley Street residence, Rudisell observed several men in the bed of a pickup truck approximately four houses away. According to Rudisell, the men were holding something on fire in their hands. Rudisell alerted the other passengers, who all looked up. Sanchez saw three bald men in muscle shirts holding "flames." The truck started moving slowly toward the Malibu, at which point Limon noticed that the man in the front passenger seat of the truck had "EME" tattooed on his arm; she recognized this tattoo as Gonzalez's.

Four of the "flames," which were in fact Molotov cocktails, were then thrown in the direction of the Malibu. One came in through the passenger window and landed on Ybanez's lap, setting both Ybanez and the car ablaze. At least one other Molotov cocktail struck the Malibu. Although Sanchez, Rudisell, and Limon were able to evacuate the

3

inferno, Ybanez's safety belt would not unbuckle.

Salinas and her children were sleeping inside the Shirley Street house when she heard a noise followed by screams and saw a flash of light through the window. Salinas opened the front door to see Ybanez's Malibu engulfed in flames, with Ybanez still inside. Eventually, Rudisell was able to unbuckle Ybanez's safety belt, at which point others pulled him out of the car and sprayed him with water.

Mario Olivarez, an officer with the Corpus Christi Police Department ("CCPD"), was dispatched to Shirley Street where he saw the Malibu still smoldering. He observed what appeared to be human skin next to the vehicle. Also, shards of brown glass were found in the Malibu and strewn on the driveway and street. George Alvarez, another CCPD officer, also responded to the scene. Officer Alvarez interviewed Limon, who could not identify or describe any suspects for him. However, Officer Alvarez did receive a description of the truck from which the incendiary projectiles were thrown.

After Rudisell and Ybanez were taken to the hospital, CCPD Detective Guadalupe Rodriguez arrived at the scene, where she interviewed Sanchez and Limon, who were reluctant to provide any information. Detective Rodriguez then visited Rudisell in the hospital, but Rudisell was under heavy sedation and could not provide any information. Detective Rodriguez returned to Shirley Street, where Sanchez and Limon were more forthcoming, describing whom they thought was involved in the attack.

Rudisell suffered burns on her face, neck, arm and hand, and was hospitalized for four to five days. Ybanez suffered severe burns on nearly fifty percent of his body, and lost large portions of skin from his stomach, chest, arms, legs and face.

4

Juarez did not volunteer any information to the police at first, but she was contacted by the police several weeks after the incident. She stated that she was taking three prescription medications for bipolar disorder and that she had been hospitalized previously because of the disorder. Xanax was not one of those prescribed medicines. Juarez told police that Rios, Gonzalez, Rodriguez, and Gordo had borrowed her mother's truck on the night in question. Juarez initially told police that she was asleep at the time and that when the men returned, she asked Rios what had happened, but Rios would not answer. Juarez testified at trial, however, that when they returned, they were acting "wound up" and told her that they had "cocktailed" Ybanez's car.

Sylvia Torres, Juarez's mother, testified that Juarez had taken her green Chevrolet Silverado four-door pickup truck without her permission on July 16, 2006. Torres stated that she called Juarez multiple times to find out where the truck was, eventually going to Garza's house in search of the truck. Torres testified that, as she arrived at Garza's house at around 1:00 a.m. on July 17, 2006, the Silverado was just pulling up to the house as well. Torres observed Rios, Gonzalez, Rodriguez, and a fourth man she did not recognize, exit the truck. At that point, Torres got into the truck and detected an odor of gasoline.

Isabel Hinojosa, Gonzalez's aunt, testified that after the arson occurred, Gonzalez went to San Antonio because the police were looking for him and "his face was on T.V." Hinojosa stated that Gonzalez told her that on the night of the arson, "all he remember[ed] was that he got into the truck, they were on Xanax pills, and he had drank alcohol and once he hit the back seat of the truck, that was it, he was out." Hinojosa testified that

5

Gonzalez told her Rios was driving the truck and Rodriguez was with them. According to Hinojosa, Gonzalez returned to Nueces County and turned himself in to police.

On September 28, 2006, a Nueces County grand jury indicted Rios, Gonzalez, and Garza on two counts of arson causing bodily injury. *See id.* On February 27, 2007, all three defendants were re-indicted, and the amended indictment included an allegation that Gonzalez had one prior felony conviction. *See id.* § 12.42(c)(1), (d) (Vernon Supp. 2008). After Garza's motion to sever was granted, the case proceeded to trial against Rios and Gonzalez. The jury was instructed that it could find Gonzalez guilty of arson under the law of parties.[1] On March 28, 2007, the jury found Rios and Gonzalez guilty on both counts. Gonzalez was sentenced to thirty-five years' confinement. This appeal ensued.

## II. ACCOMPLICE WITNESS INSTRUCTION

By his first issue, Gonzalez contends that the trial court should have instructed the jury that Juarez's testimony required corroboration because there is evidence that she was an accomplice. *See Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006) (providing that a defendant has a right to an accomplice witness instruction if the issue is raised by the evidence); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005) ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence . . . ."); *id.* art. 36.14 (Vernon 2007) (setting out that, in its charge to the

---

[1] A person is a party to an offense if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003); *Salinas v. State*, 163 S.W.3d 734, 739 (Tex. Crim. App. 2005) (providing that under the law of parties, evidence may be sufficient to convict a defendant if it shows that he is both physically present at the commission of the offense and encourages its commission either by words or by other agreement).

6

jury, a trial court must distinctly set forth the applicable law). Gonzalez did not object to the jury charge or request an accomplice-witness instruction. Thus, in order to obtain reversal on this ground, he must show that he suffered egregious harm. *Heron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002). We hold that while the evidence was sufficient to require the trial court to submit an accomplice-witness instruction, Gonzalez has not shown egregious harm.

## A.     Law Governing Accomplice Witnesses

"A witness may be an accomplice either as a matter of law or as a matter of fact; the evidence in the case determines what jury instruction, if any, needs [to] be given." *Cocke*, 201 S.W.3d at 747. The trial court must provide an accomplice witness instruction to the jury if the evidence clearly shows that the witness is an accomplice as a matter of law. *Id.* at 748. If the parties present conflicting or unclear evidence as to whether the witness is an accomplice, the trial court instructs the jury to determine whether the witness is an accomplice as a matter of fact. *Id.* "However, as with an accomplice as a matter of law, there must still be some evidence of an affirmative act on the part of the witness to assist in the commission of the charged offense before such an instruction is required." *Druery v. State*, 225 S.W.3d 491, 499 (Tex. Crim. App. 2007). The trial court is not required to include an accomplice witness instruction if it is clear from the evidence that the witness was not an accomplice as a matter of law or as a matter of fact. *Cocke*, 201 S.W.3d at 748.

An accomplice is a person who participated with the defendant before, during, or after the commission of the crime and acted with the requisite mental state. *Id.*

7

"Participation requires an affirmative act that promotes the commission of the offense with which the defendant is charged." *Id.* If there is sufficient evidence connecting a witness to the criminal offense as a blameworthy participant, then he is an accomplice. *Id.*

Under the law of parties, a person is a party to an offense if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003). "The evidence must show that, at the time of the offense, the parties were acting together, each contributing some part towards the execution of their common purpose." *Burdine v. State*, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986) (en banc); *Mullins v. State*, 173 S.W.3d 167, 174 (Tex. App.–Fort Worth 2005, no pet.); *Smith v. State*, 781 S.W.2d 675, 678 (Tex. App.–Dallas 1989, pet. ref'd). Because "an agreement between parties to act together in common design can seldom be proven by words, the State often must rely on the actions of the parties, shown by direct or circumstantial evidence, to establish an understanding or a common design to commit the offense." *Hoang v. State*, 263 S.W.3d. 18, 22 (Tex. App. Houston [1st Dist.], pet. ref'd) (citing *Miller v. State*, 83 S.W.3d 308, 314 (Tex. App.–Austin 2002, pet. ref'd)); *Segura v. State*, 850 S.W.2d 681, 684 (Tex. App.–Corpus Christi 1993,pet. ref'd).

## B. Juarez's Intent

The question that must be answered in this case is whether Juarez could have been charged as a party to the offense. *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (stating that a person is liable as a party if "he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ."). A person who provides transportation

8

for another person, knowing that the other person intends to commit a crime, is an accomplice under the law of parties. *See Phillips v. State*, 17 Tex. App. 169, 1884 WL 8645, at *5 (Tex. Ct. App. 1884) ("If Mat Sisk, knowing the unlawful intent of the defendant to commit the crime, aided him in so doing by furnishing him a horse to ride to the place where it was to be committed, he would be an accomplice in the crime, although he did not participate in its actual commission.");[2] *Longest v. State,* 732 S.W.2d 83, 86 (Tex. App.–Amarillo 1987, no pet.).

Juarez provided the men with the keys to her parents' truck, thus providing transportation necessary for the offense. *See Phillips*, 1884 WL 8645, at *5; *Longest,* 732 S.W.2d at 86. The question, then, is whether the evidence raised a fact issue as to Juarez's knowledge and intent to assist in the offense. In this case, the evidence raised an issue as to whether Juarez held a common purpose with Gonzalez and Rios and possessed the intent required to be charged for the offense as a party, including testimony regarding (1) the fight that occurred the night before the arson, (2) Juarez's knowledge that the men were considering "cocktailing" the residence when Rios asked to borrow the keys, and (3) questions about Juarez's credibility.

### 1.    The Fight

When determining if a person harbored the intent to assist with an offense or participated in a common design to commit the offense, courts can consider the

---

[2] *See* Hon. James T. "Jim" Worthen, *The Organizational and Structural Development of Intermediate Appellate Courts in Texas*, 1892-2003, 46 S. TEX. L. REV. 33, 34-35 (Fall 2004); *see also* Dylan Drummond, *Citation Writ Large*, Vol. 20, No. 2, *The Appellate Advocate*, at p. 96 (2007) (explaining that opinions of the Texas Court of Appeals between April 18, 1876 and August 13, 1892 must be accorded the precedential value of the highest court of the state for criminal matters).

defendant's actions and events occurring before, during and after the commission of the offense. *Burdine*, 719 S.W.2d at 315. A witness's prior altercation with a person who later becomes the victim of the offense is circumstantial evidence that the witness participated in a common design to commit the offense and had the requisite intent. *See* TEX. PENAL CODE ANN. § 7.02(a)(2); *see also Pena v. State*, No. 13-00-331-CR, 2003 WL 25580003, at *5 (Tex. App.–Corpus Christi Jan. 9, 2003, no pet.) (not designated for publication); *Garcia v. State,* No. 03-96-00447-CR, 1997 WL 590616, at *3-4 (Tex. App.–Austin Sept. 25, 1997, no pet.) (not designated for publication) (considering appellant's presence at a prior altercation with the victims).

Juarez testified about the fight that occurred on Saturday, July 15, which was the night before the arson. Juarez testified that she and Garza went to a club in Corpus Christi. At the club, Juarez and Garza got into a fight with Sanchez and Salinas. Juarez testified that she had "issues" with Salinas prior to the fight, but she actually fought with Sanchez. Sanchez ultimately became one of the victims of the arson.

After the fight, Juarez was kicked out of the club. Garza was hurt in the fight, suffering black eyes and a busted lip. Juarez later told the police that Garza's injuries were so bad that it frightened Juarez, and Juarez was concerned because Garza was pregnant at the time.

Juarez's fight with Sanchez, an ultimate victim of the arson, and the fact that Juarez's friend, Garza, was seriously injured in the fight, gave Juarez a motive to participate in the arson of Ybanez's house, where Sanchez and Salinas were staying at the time.

10

## 2.    Juarez's Knowledge

Next, courts have relied on an alleged party's knowledge of the impending crime when determining if the party harbored the common purpose and intent to assist with the crime. *See, e.g., Hanson v. State*, 55 S.W.3d 681, 689-90 (Tex. App.–Austin 2001, pet. ref'd) ("By appellant's own admission, he knew of Ludwick's plan to rob Cavness and to accomplish the robbery by hitting Cavness over the head."). Juarez knew that the men were going to cocktail the house when Rios borrowed the keys to the truck.

Specifically, the testimony showed that the night after the fight, Juarez, Garza, Rios, Moreno, Gonzalez, and Rodriguez went to a game room in Odem to play slot machines and poker-type games, left the game room at around 11:00 p.m., and returned to Garza's house, arriving at approximately 11:30 p.m. When they returned, the women went inside and the men stayed outside. At some point in time, Juarez went outside to see what the men were doing. She stated that "[t]hey were all chatting about what had happened at the club[,] and they were talking about that they wanted to go do something to—to somebody's house." She then testified that she heard Rios "talking about they wanted to do something to the house and they were talking about that they wanted to cocktail the house," and Gonzalez said the "same thing." She clarified that she knew the men were referring to Andres Ybanez. Juarez testified that she did not say anything, and she went inside.

Shortly thereafter, Rios came inside the house, and he asked to borrow Juarez's mother's truck. Juarez testified that this occurred at 12:30 a.m. She stated that Rios told her that "they were going to go take care of some business." Juarez gave him the keys,

11

and Rios, Gonzalez, Rodriguez, and a man nicknamed "Gordo" left in the truck.

Juarez stated that the men were gone for approximately 45 minutes. Juarez opined that when the men returned, they were "acting like they had done something, all hysterical, rowdy." Juarez testified that she spoke to Rios when he returned, and he informed her that "they had cocktailed [Ybanez's] vehicle." She did not speak to Gonzalez, but he was acting "hysterical," "jumpy," and "antsy." Juarez testified that her mother and father arrived at Garza's house after the men returned, shortly after 1:00 a.m. During Juarez's cross-examination, Juarez admitted that, when Rios asked to borrow the keys to the truck, she knew what the men were about to do:

> Defense counsel: Well, doesn't that make you a party to this offense, too? You're helping them do all of this, whatever they're going to do?
>
> Juarez: How does that make me possible of being with him?
>
> Defense counsel: Well, you've given them the keys to go do this crime. You're helping them, aren't you?
>
> Juarez: I don't completely say it's—that I'm helping them.
>
> Defense counsel: Well, you gave them the keys and you knew—what you're testifying to, you knew what they were going to do—
>
> THE COURT: Is that a question?
>
> Defense counsel: —isn't that correct?
>
> Juarez: Yes.

The State did not object to this line of questioning. We conclude that this testimony raises a fact question about whether Juarez had a common purpose with the men to commit the offense.

12

### 3. Juarez's Credibility

While Juarez denied that she intended to participate,[3] her credibility was significantly questioned at trial. First, Juarez admitted that when the group returned from the game room, she took two Xanax pills, although the drug had not been prescribed to her. Second, Juarez spoke to the police and gave a statement, but she admitted that she left out most of the important information.

Specifically, when Juarez first spoke to the police, she told them that she had been asleep during the incident. She told the police that Rios had asked to borrow the truck, and that when he returned, he refused to answer her questions. Juarez admitted that she did not immediately report these facts to the police because she was "scared" for herself, her kids, and her family. She did not come forward with additional information until four months after the incident, and even then, she did not provide the entire story that she provided at trial. While it is true that merely knowing about an offense and failing to report it does not make a person an accomplice, *Druery*, 225 S.W.3d at 498, lying to the police certainly raises questions about a person's credibility. The questions about Juarez's credibility raised a fact issue about her participation as an accomplice. *See Biera v. State*, 280 S.W.3d 388, 394 (Tex. App.–Amarillo 2008, pet. ref'd) (holding that fact question existed as to witness's status as accomplice where witness denied her intent to aid in the offense but witness's drug use and other bad acts raised a question about her credibility). Accordingly, the evidence warranted an accomplice-witness instruction in this case.

---

[3] Juarez testified, "I don't completely say it's—that I'm helping them."

13

## C.    Egregious Harm

Where the defendant has not objected to the omission of an accomplice witness instruction, he must show egregious harm.  *Heron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).  "Under the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'"  *Id.* (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)). "In determining the strength of a particular item of non-accomplice evidence, we examine (1) its reliability or believability and (2) the strength of its tendency to connect the defendant to the crime."  *Id.*  For example, if the non-accomplice testimony is weak and is contradicted by other evidence such that the corroborating evidence, even if believed, did not have a strong tendency to connect the defendant to the crime, egregious harm may be shown.  *Id.* (citing *Saunders*, 817 S.W.3d at 692).

Here, the evidence tending to connect Gonzalez to the crime included:  (1) Limon's testimony identifying Gonzalez as one of the passengers in the truck at the time of the arson based on her description of a tattoo on his arm; (2) Gonzalez's admission to his aunt that he had been in the truck at the time; (3) Torres's identification of Gonzalez as one of the men exiting her truck when she arrived at Garza's house, immediately after the arson; and (4) Gonzalez's flight to San Antonio after the arson.

With respect to Limon's identification, the contrary evidence included that it was dark outside, Limon was six feet away from the truck, and at one point, Limon told the

14

police that the windows on the truck were tinted, suggesting that Limon could not have seen Gonzalez's tattoo. Gonzalez asserts that his admission to his aunt and Torres's identification of him as one of the men exiting her truck merely placed Gonzalez at the scene of the crime but did not establish that he actually participated in the crime. In fact, Gonzalez told his aunt that he was intoxicated and had passed out during the events. Finally, the evidence showed that Gonzalez was a friend of the Ybanez family and had resided with them in the past.

Although there is contrary evidence, each of these pieces of evidence nevertheless has a strong tendency to connect Gonzalez to the offense. While we agree that presence at the crime scene is insufficient to corroborate an accomplice's testimony, "evidence that an accused was in the company of the accomplice close to the time of the offense, coupled with other suspicious circumstances, may tend to connect the accused to the offense." *Gill v. State*, 873 S.W.2d 45, 49 (Tex. Crim. App. 1994). Although Gonzalez argues that the evidence merely establishes his presence at the scene, he fails to account for his flight to San Antonio, which is evidence of his guilt. *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994); *Johnson v. State*, 234 S.W.3d 43, 55 (Tex. App.–El Paso 2007, no pet.). Thus, Gonzalez has not shown egregious harm, and we overrule his first issue.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

By his second and third issues, Gonzalez contends that trial counsel rendered ineffective assistance by: (1) not requesting an accomplice-witness instruction in the trial court's jury charge; and (2) failing to request and use an expert on eyewitness

15

identification.

## A.      Standard of Review and Applicable Law

Ineffective assistance of counsel claims are evaluated under the two-part test articulated by the Supreme Court in *Strickland v. Washington*. *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). The *Strickland* test requires that Gonzalez show that counsel's performance was deficient, or in other words, that counsel's assistance fell below an objective standard of reasonableness. *Thompson*, 9 S.W.3d at 812; *see Strickland*, 466 U.S. at 689, 694. Assuming Gonzalez has demonstrated deficient assistance, he must then show that there is a reasonable probability that, but for counsel's errors, the result would have been different. *Thompson*, 9 S.W.3d at 812; *see Strickland*, 466 U.S. at 689, 694. In determining the validity of Gonzalez's claim of ineffective assistance of counsel, "any judicial review must be highly deferential to trial counsel and avoid the deleterious effects of hindsight." *Thompson*, 9 S.W.3d at 813.

The burden is on Gonzalez to prove ineffective assistance of counsel by a preponderance of the evidence. *Id.* Gonzalez must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689; *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.). A reviewing court will not second-guess legitimate tactical decisions made by trial counsel. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008). Counsel's

16

effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813; *Jaynes*, 216 S.W.3d at 851.

Our review of counsel's representation is highly deferential, and we will find ineffective assistance only if the appellant overcomes the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. The acts or omissions that form the basis of appellant's claim of ineffective assistance must be evidenced by the record. *See Thompson*, 9 S.W.2d at 814; *Jaynes*, 216 S.W.3d at 851. In most cases, a silent record which provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); *Thompson*, 9 S.W.3d at 813-14. "These demanding standards are virtually impossible to meet when no proper evidentiary record was developed at a hearing on a motion for new trial." *Chavero v. State*, 36 S.W.3d 688, 701 (Tex. App.–Corpus Christi 2001, no pet.). As the court of criminal appeals has noted:

> A substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on direct appeal. Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation. In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel.

*Thompson*, 9 S.W.3d at 813-14 (footnote omitted).

## B. Discussion

In this case, trial counsel did not request an accomplice witness jury instruction. The failure of counsel to request an accomplice witness instruction when facts warrant

17

such an instruction may constitute deficient performance. *Hall v. State*, 161 S.W.3d 142, 152 (Tex. App.–Texarkana 2005, pet. ref'd) (citing *Henson v. State*, 915 S.W.2d 186, 197 (Tex. App.–Corpus Christi 1996, no pet.)).  However, Gonzalez did not file a motion for new trial or provide his counsel with an opportunity to explain his actions.  Accordingly, we cannot say, on this record, that Gonzalez has overcome the strong presumption of reasonable assistance.  *Mallett*, 65 S.W.3d at 63; *Thompson*, 9 S.W.3d at 813-14; *see also Rios v. State*, 2008 Tex. App. LEXIS 6524, at *21.  We overrule Gonzalez's second issue.[4]

Next, Gonzalez contends that trial counsel was ineffective by "failing to request and use an expert on eyewitness identification."  Specifically, Gonzalez argues that an expert witness would have explained to the jury the likelihood that Limon's identification of Gonzalez was mistaken.

However, trial counsel's failure to request the appointment of an expert witness is generally not ineffective assistance unless it is shown that the expert witness's testimony

---

[4] We note that, should Gonzalez attempt to develop the record in a habeas corpus proceeding, our finding that he failed to show egregious harm from the trial court's failure to submit an accomplice-witness instruction would not preclude a finding of ineffective assistance of counsel, which is judged by a different standard.  *See Davis v. State*, 278 S.W.3d 346, 351 & n. 6 (Tex. Crim. App. 2009) (reviewing Davis's claim of ineffective assistance based on counsel's failure to request accomplice-witness instruction, even though court of appeals found that Davis did not suffer egregious harm and that finding was not challenged on appeal).  As the Texas Court of Criminal Appeals explained,

> In our view, if trial counsel performs deficiently in failing to request an accomplice-witness instruction, then the question of whether there is a reasonable probability that, but for counsel's deficient performance, the result of the guilt stage would have been different will not turn simply on whether the non-accomplice evidence sufficed to connect the defendant to the crime charged or even whether such evidence would itself support the verdict of guilt.  Rather, that question will generally turn on whether there was a substantial amount of non-accomplice evidence and whether the record reveals *any rational basis* on which the jury could have doubted or disregarded that evidence.

*Id.* at 353 (emphasis added).

18

would have benefitted the defendant. *See Cate v. State*, 124 S.W.3d 922, 927 (Tex. App.–Amarillo 2004, pet. ref'd); *Teixeira v. State*, 89 S.W.3d 190, 194 (Tex. App.–Texarkana 2002, pet. ref'd); *McCain v. State*, 995 S.W.2d 229, 246 (Tex. App.–Houston [1st Dist.] 1999, pet. ref'd, untimely filed); *see also Butler v. State*, 716 S.W.2d 48, 55 (Tex. Crim. App. 1986) (providing that the failure to call witnesses does not constitute ineffective assistance of counsel without a showing that the witnesses were available to testify and that their testimony would have benefitted the defendant). Here, the record does not substantiate Gonzalez's claim that he received ineffective assistance of counsel with regard to the issue of the expert. There is nothing in the record showing that an expert witness had been contacted and was willing to testify or what his testimony would have been with respect to Limon's identification of Gonzalez. It is mere speculation whether such a mitigation expert existed or whether the expert's testimony would have benefitted Gonzalez. Therefore, because Gonzalez has not established that an expert witness would have testified in a manner that benefitted him, we cannot say that counsel's performance was deficient. Moreover, Gonzalez has not shown a reasonable probability that had trial counsel requested an expert on eyewitness identification, the result of the proceeding would have been different. *Thompson*, 9 S.W.3d at 812; *see Strickland*, 466 U.S. at 689, 694. Accordingly, we overrule Gonzalez's third issue. *Thompson*, 9 S.W.3d at 812, 814; *see Strickland*, 466 U.S. at 689, 694.

## IV. Conclusion

We affirm the trial court's judgment.

19

_____
GINA M. BENAVIDES,
Justice


Do not publish. TEX. R. APP. P. 47.2(b).

Concurring Memorandum Opinion
by Justice Linda Reyna Yañez.

Memorandum Opinion delivered and
filed this the 30th day of July, 2009.